**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CENTER FOR CONSTITUTIONAL RIGHTS; DETENTION WATCH NETWORK; HAITIAN BRIDGE ALLIANCE; | |
| *Plaintiffs,* | Civil Action No.: 25-cv-6214 |
| v. | |
| UNITED STATES DEPARTMENT OF DEFENSE; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; UNITED STATES CUSTOMS AND BORDER PROTECTION; UNITED STATES DEPARTMENT OF STATE; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| *Defendants.* | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### Preliminary Statement

1.    This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *et seq.*, for injunctive and other appropriate relief, seeking the immediate processing and release of agency records requested by the Center for Constitutional Rights, the Haitian Bridge Alliance, and Detention Watch Network (collectively, "Requestors" or "Plaintiffs") from the U.S. Department of Defense ("DOD"), the Department of Homeland Security ("DHS"), U.S. Customs and Border Protection ("CBP"), U.S. Immigration and Customs Enforcement ("ICE"), U.S. Citizenship and Immigration Services ("USCIS") and the Department of State ("DOS") (collectively, "Defendants"), as well as offices and components within each of the Defendant

1

agencies which hold responsive records.

2.      On February 6, 2025, Requestors filed a FOIA request with Defendants[1] seeking information on the reported expansion of the Migrant Operations Center ("MOC") at the United States Naval Base at Guantánamo ("Guantánamo"), and plans, pursuant to President Trump's January 20, 2025 Executive Order 14165 titled "Securing Our Border," and his January 29, 2025 Presidential Memorandum titled "Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity"[2] ("Trump Guantánamo EO"), to detain many thousands of migrants currently detained or residing in the territorial United States. A true and correct copy of the Request is attached as Exhibit A.

3.      The need for transparency regarding the implementation of the Trump Guantánamo EO is of absolute urgency, as the Administration has already sent hundreds of noncitizens into detention without affording these individuals basic due process, meaningful access to counsel, or any meaningful recourse to challenge their extraterritorial detention. Indeed, particularly in light of the Administration's secrecy around these extra-legal detentions, this FOIA is necessary to unearth vital information regarding U.S. government activities at Guantánamo, threats to the life or physical safety of the detainees, and the detainees' loss of substantial due process rights.

4.      As explained in their FOIA request and subsequent correspondence with Defendants, for example, Plaintiffs are urgently interested in obtaining information concerning: (1) who is being transferred from the United States to Guantánamo; (2) why they are being sent there; (3) which agency or agencies maintain custody of the detainees; (4) the roles and

---

[1]      All Defendants were sent a copy of the FOIA request on February 6, 2025, except USCIS, which was sent a copy of the FOIA request on March 12, 2025.

[2]      *See* White House, "Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity" (Jan. 29, 2025), https://perma.cc/D2P3-45SN ("Memorandum").

responsibilities of each agency including, for example, DOD's involvement in immigration detention operations and other civilian law enforcement operations; (5) whether the detainees are subject to questioning or interrogation, and, if so, by whom and for what purpose; (6) the detainees' conditions of confinement including, for example, their access to legal counsel and medical care at Guantánamo; (7) where detainees are being transferred from Guantánamo and whether such transfers comply with the United Nations Convention Against Torture and other applicable laws; and (8) the legal basis for all of the foregoing aspects of the Defendants' continued use of Guantánamo as an immigration processing and detention facility. Requestors also requested fee waivers and expedited processing of their FOIA request from Defendants.

## Jurisdiction and Venue

5.     This Court has subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. §§ 552(a)(4)(B) and 552(a)(6)(C)(i). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331. Venue is proper in this district under 5 U.S.C. § 552(a)(4)(B), because a plaintiff resides in this district.

6.     Because Defendant has failed to comply with the time limits imposed by the FOIA, Plaintiffs have exhausted their administrative remedies. *Id.* § 552(a)(6)(C)(i). Plaintiffs are therefore entitled to appeal directly to this Court for relief. *Id.* § 552(a)(4)(B).

## Parties

7.     Plaintiff Center for Constitutional Rights ("CCR") is a non-profit, public interest, legal and public education organization that engages in litigation, public advocacy, and the production of publications. CCR's diverse dockets include litigation and advocacy around Guantánamo detentions, immigration enforcement policies, policing, and racial and ethnic profiling. CCR's primary activities include the publication of newsletters, know-your-rights

handbooks, and legal analysis of current immigration law issues for public dissemination, all of which are freely available to the public. In addition, CCR regularly issues press releases and operates an e-mail list of over 50,000 members. CCR's office and principal place of business is in New York, New York.

8.      Plaintiff Haitian Bridge Alliance ("HBA") is a grassroots and community-based non-profit organization that advocates for fair and humane immigration policies and provides migrants and immigrants with humanitarian, legal, and social services, with a particular focus on Black migrants, the Haitian community, women and girls, LGBTQIA+ individuals, and survivors of torture and other human rights abuses. HBA regularly organizes Know Your Rights presentations, legal orientation trainings, and the recording and dissemination of explanatory videos for migrants in the United States and for those on the Mexico side of the U.S. border. HBA regularly disseminates information learned to international human rights mechanisms through reporting on the U.S.'s compliance with its human rights obligations, with a focus on U.S. border policies and their impact on Black people in transnational migration. HBA staff members often serve as sources for journalists and media outlets, including on issues related to immigration, racial justice, U.S. policy towards Haiti and Haitian migrants, and immigrant rights. In addition, HBA regularly issues press releases and has an active social media presence.

9.      Plaintiff Detention Watch Network ("DWN") is a national coalition of organizations and individuals working to expose and challenge the injustices of the U.S. immigration detention and deportation system and advocate for profound change that promotes the rights and dignity of all persons. DWN was founded in 1997 in response to the explosive growth of the immigration detention and deportation system in the United States. Today, DWN is the only national network that focuses exclusively on immigration detention and deportation

issues. DWN is recognized as the "go-to" resource on detention issues by media and policymakers and known as a critical national advocate for just policies that promote an eventual end to immigration detention. As a member-led network, DWN unites diverse constituencies to advance the civil and human rights of those impacted by the immigration detention and deportation system through collective advocacy, public education, communications, and field and network-building. DWN has a well-known website featuring the latest news, information and developments on detention policy.

10.     Defendant DOD is a federal agency in the Executive Branch of the United States within the meaning of 5 U.S.C. § 552(f)(1).

11.     Defendant DHS is a federal agency in the Executive Branch of the United States within the meaning of 5 U.S.C. § 552(f)(1).

12.     Defendant CBP is a component of DHS and is a federal agency within the meaning of 5 U.S.C. § 552(f)(1).

13.     Defendant ICE is a component agency of DHS and a federal agency within the meaning of 5 U.S.C. § 552(f)(1).

14.     Defendant USCIS is a component agency of DHS and a federal agency within the meaning of 5 U.S.C. § 552(f)(1).

15.     Defendant DOS is a federal agency in the Executive Branch of the United States within the meaning of 5 U.S.C. § 552(f)(1).

16.     Plaintiffs are informed and therefore believe that Defendants have possession, custody, or control of the requested records.

## FACTUAL BACKGROUND

### Historical Background Of U.S Detention Operations at Guantánamo Bay

17.    The United States seized Cuba and occupied the country for years after the 1898 Spanish-American War. As a precondition to permitting Cuban independence, the U.S. imposed upon Cuba a lease agreement that granted the U.S. the right to use approximately 45 square miles of land in Guantánamo Bay, in perpetuity, solely "for the purposes of coaling and naval stations," a provision reaffirmed by a subsequent 1934 treaty.  This delimitation notwithstanding, the U.S. began using Guantánamo for immigration processing and military detention as early as the 1970s, albeit only for noncitizens interdicted at sea or in the post-9/11 era, noncitizens from foreign countries. Until now, the island prison has never been used to hold individuals transported from inside the territorial United States, including those with ongoing immigration proceedings.

18.    In the 1970s, Haitians fleeing the brutal François Duvalier dictatorship in search of safe haven often took to the sea, routinely passing through dangerous straits in and around Guantánamo Bay. In response, U.S. officials stationed on the island began detaining and processing these individuals at Guantánamo on an ad-hoc basis.  A 1978 U.S. Immigration and Naturalization Service "(INS")" memorandum discussed the possibility of a more permanent program through which the U.S. "Coast Guard [could] transport Haitians [encountered in open waters] to Guantanamo Bay." This approach was rejected in favor of then-President Ronald Reagan's 1981 Haitian Migrant Interdiction Operations program, implemented to move credible fear screenings offshore and aboard U.S. Coast Guard vessels—an extant program known today as the Alien Migrant Interdiction Operations.

6

19.      Although the U.S. detained and processed over 20,000 migrants through the interdiction program during the 1980s, the early 1990s saw an acute increase in individuals fleeing both Haiti and Cuba. Accordingly, in 1991, the U.S. greatly expanded its detention operations at Guantanamo to detain fleeing refugees and to prevent them from reaching U.S. soil, where they might claim the protections of U.S. and international law. By December 1991, the U.S. detained more than more than 6,000 migrants at Guantanamo[3]; by 1994 that number exceeded 40,000.[4] The U.S. provided substandard conditions at the facilities, subjecting migrants to crowding, abusive treatment, and a lack of adequate medical care including forcibly administering birth control.[5] The U.S. government also covertly tested Haitian asylum seekers at Guantánamo for HIV and sequestered those testing positive at a detention facility known as Camp Bulkeley.

20.      Requestor CCR filed a lawsuit alleging that the totality of the U.S.' policies denied detained Haitians their constitutional rights, and, on March 26, 1993, U.S. District Judge Sterling Johnson, Jr. ruled that the U.S. had to either provide adequate medical treatment for the HIV-positive refugees at Guantánamo or send them where they could be treated; he described Camp Bulkeley as an "HIV prison camp." Eventually, as a result of a settlement of this litigation, those Haitians stationed in Guantanamo were released into the United States to seek immigration relief there.

21.      Although the detention and processing center at Guantanamo largely wound down in 1996, the U.S. continued to apprehend and divert migrants interdicted on the Caribbean Sea to

[3]      Barbara Crossette, *U.S. Transfers Haitians to Base in Cuba*, N.Y. Times, Nov. 27, 1991, at A3; Barbara Crossette, *U.S. Expanding Refugee Center As More Haitians Flee Homeland*, N.Y. Times, Dec. 3, 1991.

[4]      *Naval Station Guantanamo Bay: History and Legal Issues Regarding Its Lease Agreements*, Congressional Research Service, updated Aug. 1, 2022, https://sgp.fas.org/crs/natsec/R44137.pdf

[5]      Steven W. Thrasher, *The Shameful and Forgotten Origin of Guantanamo Bay*, Rolling Stone, Aug. 2, 2022, https://www.rollingstone.com/culture/culture-features/guantanmo-bay-1391099/

Guantánamo, where they were detained and processed for possible repatriation or third-country resettlement at the Migration Operations Center ("MOC"), a detention facility established in the mid-to-late 1990s and operated by the Bureau of Population, Refugees, and Migration ("PRM") at DOS, and USCIS under DHS.  Since then and until the Trump Guantanamo EO was issued in early 2025, small numbers of migrants interdicted at sea have been detained and processed at the MOC. As explained below, since the Trump Guantanamo EO, the number of migrants detained at the MOC has increased significantly. The MOC is currently used to detain migrants whom the U.S. alleges present "low" or "medium" threats. In addition, at least as a colloquial matter, in recent months the term "MOC" has been expanded in public discourse to include and reference not only the original MOC facility located on the Leeward side of Guantanamo, but also other detention facilities at Guantánamo, including what has been known in more recent years as "Camp 6" (or "Camp VI") located within the DOD-controlled Joint Task Force- Guantánamo ("JTF-GTMO") area of operations on the Windward side of Guantanamo.  Camp 6 is currently used to detain migrants whom the U.S. alleges present "high" threats.

22.    After the September 11, 2001 attacks and the U.S. invasion of Afghanistan in October 2001, the U.S. again greatly expanded its detention of non-U.S. citizens at Guantánamo. Since January 11, 2002, the U.S. has constructed and maintained a purported law-of-war detention facility within the JTF-GTMO area of operations at Guantánamo, which is controlled principally by DOD, and which has been comprised over the last two decades of several "camps" such as Camp X-Ray, Camps Echo I and II, Camp Delta (including Camps 1 to 4), Camps 5 and 6, Camp Iguana, and Camp 7, and has been used primarily to interrogate and detain indefinitely in DOD custody about 780 Muslim men and boys captured in the so-called global war on terror, who the U.S. alleges are part of the Taliban, Al Qaeda, or certain associated forces that the U.S.

claims are co-belligerents under the laws of war. The United States deliberately chose Guantánamo as a place to hold these post-9/11 detainees because it was thought to be a "legal black hole," or "the legal equivalent of outer space"—explicitly outside U.S. borders and the jurisdiction of U.S. courts, where the U.S. contended that such foreign nationals held on the asserted foreign sovereign territory in Cuba were entitled to no rights the government was bound to respect. Put differently, Guantánamo was chosen because it was thought to be a place where the U.S. could send detainees, and interrogate them or do whatever it wanted to them, for as long as it wanted, without any outside scrutiny from the courts, the media, or the public at large.

23.     The first planeload of these detainees arrived at the law-of-war detention facility on January 11, 2002. And similar to the legal challenge that Requestor brought in the 1990s, Requestor CCR filed the first habeas cases in February 2002, challenging indefinite law-of-war detention at Guantanamo.  Requestor CCR litigated the question whether the U.S. government could hold detainees indefinitely in a law-free zone at Guantánamo, and ultimately prevailed before the U.S. Supreme Court, which held that detainees have a statutory and constitutional right to challenge the factual and legal basis for their detention at Guantánamo by filing petitions for writs of habeas corpus in U.S. courts. *See, e.g.*, *Boumediene v. Bush*, 553 U.S. 723 (2008); *Rasul v. Bush*, 542 U.S. 466 (2004).  Currently, 15 men remain in law-of-war detention at Guantánamo. Nine have died at Guantánamo in the last twenty years, and more than 750 have been transferred and repatriated or resettled in third countries.

24.     In each of the foregoing respects, U.S. detention practices in Guantánamo have historically violated fundamental human rights and domestic constitutional norms. It has been a site of lawlessness, cruelty, and punishment which has rightly produced widespread international condemnation over the years, particularly in the post-9/11 era with ever-continuing revelations of

detainee torture and abuse at Guantánamo. Given the grotesque and systematic human rights abuses that occurred there, and global condemnation of extra-legal practices that U.S. engaged in there, Guantánamo has become a global icon of, and shorthand for, brutality and lawlessness. After reaching its peak of several hundred law-of-war detainees in the Spring of 2002, every President – including two terms of the George W. Bush Administration, two terms of the Obama Administration, the Biden Administration, and even the first Trump Administration – has sought to keep stable or decrease the number of detainees held there, rather than project any U.S. embrace of the ugly legacy of that island prison situated beyond the law.

### The Trump Administration's Resurrection of the
### Disgraced Detention Operations at Guantanamo

25.     The Trump Administration's recent efforts to dramatically expand detention operations at Guantanamo are shocking and unprecedented – and seemingly designed to project the very human cruelty and dominion over others that prior administrations and the global community had condemned. The Trump Guantánamo EO contemplates, for the first time in nearly twenty years, that large numbers of individuals would be transferred or detained in Guantánamo. Notably, too, until now, no Guantanamo detainee has ever been transferred from inside the territorial United States (where they would indisputably enjoy full constitutional rights) to Guantánamo.  In addition, the Trump Administration has for the first time inextricably intertwined migrant detention operations with military detentions at Guantánamo, including, upon information and belief, involving DOD personnel directly in immigration detention and other civil law enforcement operations at Guantánamo in violation of U.S. and international law, including the Posse Comitatus Act.

26.     For example, as noted above, although the U.S. is obviously not at war with immigrants in any serious or legitimate respects, non-U.S. citizens transferred to Guantanamo

directly from the U.S. are now detained in the law-of-war facility known as Camp 6, within the DOD-controlled JTF-GTMO area of operations, and DOD personnel appear deeply involved in all aspects of migration detention operations at Guantanamo. In particular, in response to the Trump Guantanamo EO, on January 30, 2025, DOD established Joint Task Force-Southern Guard ("JTF-SG") to carry out the President's mandated expansion of the MOC and other immigration detention operations at Guantánamo. Requestors are informed and believe that JTF-SG is directly responsible for the care and control, and effectively maintains custody, of all immigration detainees at Guantánamo, including their transportation, security, discipline and punishment, food, shelter, medical care, and access to legal counsel and the courts–or lack thereof.  In addition, Requestors are informed and believe that Defendant DOD, including JTF-GTMO and JTF-SG, are involved in migration detention operations at Guantánamo pursuant to memoranda and other written guidance with the other Defendants in this case, including, in particular, for example, memoranda of understanding between or among JTF-GTMO, JTF-SG, DHS, and ICE.

27.    In order to determine the true nature and scope of these intra- and inter-agency operations, and migration detention operations more broadly pursuant to the Trump Guantánamo EO, which are matters urgent and vital to the public's understanding of U.S. government operations at Guantánamo–one of the world's most notorious offshore prisons–Requestors filed their FOIA request. This action is necessary to rectify Defendants' failure to respond meaningfully to that request. Accordingly, this case seeks declaratory relief that Defendants are in violation of the FOIA for failing to fulfill Plaintiffs' request for records, and injunctive relief ordering Defendants to comply immediately and fully with the request under the FOIA.

**Plaintiffs' FOIA Request**

28.    Requestors' FOIA request aims to shed light on the agencies responsible for implementing the Trump Guantánamo EO. Requestors are gravely concerned about the practice of moving noncitizens apprehended and detained in the United States to Guantánamo. Requestors have a unique blend of experience with systemic abuses of power in immigration detention as well as the policy and practice of disappearing and torturing noncitizens on Guantánamo.

29.    As noted above, in February 2002, Requestor CCR filed the first legal challenge to the proposed indefinite, incommunicado detention of detainees at Guantánamo in federal court, which was captioned *Rasul v. Bush*, 542 U.S. 466 (2004). The case eventually reached the Supreme Court and, on June 28, 2004, the Court ruled against the Bush Administration, holding that detainees possessed rights under the habeas corpus statute in substantial part because Guantánamo was, "in every practical respect a United States territory." *Id.* at 487. With detainees' right to challenge the legality of their detention, came an unambiguous right to retain and have meaningful access to counsel. In the subsequent years, CCR would coordinate the representation of nearly all of the 780 men detained there.  For more than twenty years, CCR lawyers have represented clients in Guantánamo in habeas cases, military commission proceedings, and various administrative review proceedings, and have helped secure fundamental constitutional protections for those detained. *See Boumediene v. Bush*, 553 U.S. 723, 765 (2008) (establishing right to habeas corpus at Guantanamo and observing that the U.S. government may not "switch the Constitution on or off at will.").

30.    These representations have included in-person meetings at Guantánamo since 2004, as well as communicating with detainee clients by legal mail and secure telephone and

videoconferencing lines. Simply stated, attempts to restrict counsel access to clients have been firmly rejected by federal courts. *See, e.g.*, *In re Guantanamo Bay Detainee Continued Access to Counsel*, 892 F. Supp. 2d 8, 28 (D.D.C. 2012) ("The Court has an obligation to assure that those seeking to challenge their Executive detention by petitioning for habeas relief have adequate, effective and meaningful access to the courts."); *id.* at 16 ("The Court is simply not obliged to give the Executive the opportunity to create its own [habeas] procedures. To do so would be to allow the Government to transgress on the Court's duty to safeguard individual liberty by 'calling the jailer to account.'") (quoting *Boumediene*, 553 U.S. at 745-46).

### Degrading Conditions of Confinement and
### Lack of Counsel Access at Guantánamo

31.     In contrast to more than 20 years of precedent at Guantánamo, Plaintiffs have now learned that the government has transferred immigration detainees from the territorial United States to Guantánamo, holding them incommunicado, without meaningful access to attorneys, family, or the outside world. Only after Requestor CCR and other legal organizations and family members of the detained individuals filed separate federal lawsuits challenging their complete isolation were the detainees permitted limited and plainly insufficient access to counsel.  *See, e.g., Las Americas Immigrant Advocacy Center v. Noem*, No. 25-cv-00418 (D.D.C.); *Luna Gutierrez v. Noem*, No. 25-cv-01766 (D.D.C.).

32.     What has been revealed thus far by people who have been transferred to Guantánamo is disturbing. Early reports indicated that immigration detainees have been subjected to conditions of confinement that are not only unlawfully punitive, but also rise to the level of torture or other unlawful abuse. For example, early reports indicated that detainees have been held in solitary confinement, have been subject to unlawful physical and psychological abuse (or threats of such abuse), denied adequate food or medical care, and denied meaningful

access to their families, legal counsel, or, ultimately, the courts. Early reports also indicated that these degrading conditions and extreme isolation have led to several suicide attempts by detainees.

33.    Of particular importance to the FOIA request, in the early days of immigration detention pursuant to the Trump Guantanamo EO, detainees at Guantánamo were entirely cut off from communicating with their families. After regularly speaking to their families while detained in the United States, the detainees could not make a phone call to let their families know where they were. Although detainees have been granted some access to their families and legal counsel, such access remains extremely limited. Detainees are allowed one call to their families per week, though guards have reportedly used this as a threat and manipulation tool. And while detainees have been allowed calls with legal counsel, they are still denied in-person meetings with counsel–including Requestor CCR, as noted above, whose staff travelled to Guantánamo in the 1990s to meet with Haitian detainees, and who have routinely travelled to Guantánamo since 2004 to meet with their law-of-war detainee clients. In the decades long saga of Guantánamo, only the Trump Administration has categorically denied detainees in-person access to CCR attorneys, notwithstanding that immigration detainees transferred to Guantanamo from the United States indisputably have full constitutional rights.

34.    Adding to the uncertainty, the Administration both promptly emptied Guantánamo[6] of noncitizens, promised (and followed through) to send more noncitizens to Guantánamo,[7] and returned individuals back to the United States after being held there.[8] The

---

[6]    Bernd Debusmann Jr., *Migrants held at Guantanamo transferred to US*, BBC (Mar. 13, 2025), https://www.bbc.com/news/articles/cjw21y5043yo.

[7]    Carol Rosenberg, Charlie Savage, & Hamed Aleazis, *Trump Administration Sends a New Group of Migrants to Guantánamo Bay*, N.Y. TIMES (Mar. 20, 2025), https://www.nytimes.com/2025/03/20/us/politics/more-migrants-guantanamo-bay.html.

American public deserves further information on what appears to be a futile,[9] financially irresponsible,[10] and completely impractical[11] endeavor.

35. Since February 2025, the U.S. has detained approximately 500 immigrants at Guantánamo for temporary periods of time, including Haitian nationals,[12] with scores of immigrants being sent back to facilities in Louisiana in March due to suspected capacity issues.[13] The reported cost of these detentions amounted to more than $40 million, or approximately $100,000 per day per detainee.[14] In June 2025, reports indicated that the Trump Administration was preparing to ramp up its efforts to send thousands of undocumented immigrants to Guantánamo, with at least 9,000 people being vetted for transfer.[15] The foreign nationals under consideration include approximately 800 European nationals.[16]

[8]    Arden Dier, *All Migrants at Guantanamo Sent Back to US*, NEWSER (Mar. 13, 2025), https://www.newser.com/story/365634/all-migrants-at-guantanamo-moved-back-to-us.html.
[9]    Haley Britzky, Priscilla Alvarez, & Annie Grayer, *Trump plan to house migrants at Guantanamo Bay faces mounting hurdles, internal doubts*, CNN (Mar. 14, 2025), https://www.cnn.com/2025/03/14/politics/guantanamo-migrants-trump/index.html.
[10]    Billal Rahman, *ICE Wastes $16M on Guantanamo Bay Operation as All Migrants Returned to US*, NEWSWEEK (Mar. 13, 2025), https://www.newsweek.com/ice-guantanamo-bay-migrants-immigration-waste-millions-back-usa-2044018.
[11]    Demian Bio, *Trump Said Guantanamo Bay Facility Could Hold 30,000 Migrants, But Right Now It's Fit For Less Than 1% Of That*, LATIN TIMES (Mar. 12, 2025), https://www.latintimes.com/trump-said-guantanamo-bay-facility-could-hold-30000-migrants-right-now-its-fit-less-1-that-578241.
[12]    Jacqueline Charles and Syra Ortiz Blanes, *After labeling transfers to Guantánamo as 'fake news,' Trump deports Haitians from there,* Miami Herald (Updated Jun. 25, 2025 11:51 AM), https://www.miamiherald.com/news/nationworld/world/americas/haiti/article308884995.html
[13]    Nahal Toosi & Myah Ward, *Trump team plans to send thousands of migrants to Guantanamo starting as soon as this week*, Politico (June 10, 2025), https://www.politico.com/news/2025/06/10/trump-plans-migrants-guantanamo-bay-00396673.
[14]    Ted Hesson, *Trump Migrant Detentions at Guantanamo Bay Cost $100,000 Per Person Daily, Senator Says*, Reuters (May 20, 2025), https://www.reuters.com/world/us/trump-migrant-detentions-guantanamo-bay-cost-100000-per-person-daily-senator-2025-05-20/.
[15]    *Id.*; John Hudson & Alex Horton, *Trump to ramp up transfers to Guantánamo, including citizens of allies*, Washington Post (June 11, 2025), https://www.washingtonpost.com/national-security/2025/06/10/trump-guantanamo-deportations/.
[16]    *Id.*

## Substance of Requestors' FOIA Request

36.    On February 6, 2025, Requestors submitted a FOIA request to Defendants DOD,

DHS, DOS, ICE, and CBP seeking records related to the use of Guantánamo as a civil

immigration detention facility. *See* Exhibit A. The FOIA request was sent to each agency via

Federal Express. Proof of delivery for each agency is attached as Exhibit B.

37.    On March 12, 2025, Requestors submitted the same FOIA request to USCIS via

email and USCIS's online platform.

38.    Specifically, among other records included in the FOIA request, the request seeks

information regarding:

(i)    What criteria will be used to select and send migrants from the United
States or other locations to detention in Guantánamo?

(ii)   Will individuals selected and sent to Guantánamo be in the midst of
immigration proceedings and at what stage of their proceedings will they
be?

(iii)  What anticipated legal process will be available to individuals detained
there and will the Trump Administration comply with strictures of due
process and other constitutional, statutory, and regulatory requirements
mandated by US law?

(iv)   What concrete provisions to accommodate lawyer access – both in person
and remotely given Guantánamo's remote location – will be made
available?

39.    Requestors applied for expedited processing, on the grounds that there is a

"compelling need" for these records under 5 U.S.C. § 552(a)(6)(E)(i)(I) because the information

requested is "urgen[tly]" needed by an organization primarily engaged in disseminating

information "to inform the public about the legality of the EO." Exhibit A.

40.    Requestors also applied for a fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(iii)

on the grounds that "disclosure of the requested records is in the public interest because it is

likely to contribute significantly to the public understanding of the activities or operations of the

government and is not primarily in the commercial interest of the Requestor[s]." Exhibit A.

Requestors also relied on 5 U.S.C. § 552(a)(4)(A)(iii) on grounds that CCR, DWN and HBA qualify as "representatives of the news media" whose purpose in requesting the information is to disseminate it freely and publicly.

**Defendants' Responses to the Request**

41.     As of the filing date of this Complaint, Defendants have not produced any records in response to the FOIA Request.


*Response from ICE*

42.     On February 7, 2025, "J. REYES" at ICE received Plaintiffs' FOIA request via Federal Express, tracking number 771916724002.

43.     On February 19, 2025, ICE responded via email by acknowledging receipt of Plaintiffs' request and stating that it would take the additional 10 days to make a determination on the request.

44.     In the same email, ICE granted Plaintiffs' request for a fee waiver and denied the request for expedited processing.

45.     As of the date of this filing, Plaintiffs have received no further response from ICE.


*Response from DHS*

46.     On February 7, 2025, "J. REYES" at DHS received Plaintiffs' FOIA request via Federal Express, tracking number 771916640760.

47.     On February 26, 2025, DHS acknowledged Plaintiffs' FOIA request but stated it was overbroad, and would close the request if Plaintiffs did not respond within 30 days.

48.     On March 13, 2025, Plaintiffs responded to DHS's acknowledgment, confirming

that the FOIA request was not overbroad in any of the ways alleged by DHS and that the agency should immediately continue processing the FOIA request per its statutory obligation.

49.    On March 24, 2025, DHS responded with an updated acknowledgment, stating it would process Plaintiffs' FOIA request, and that it was conditionally granting Plaintiffs' fee waiver request and denying Plaintiffs' expedited processing request.

50.    As of the date of this filing, Plaintiffs have received no further responses from DHS.

*Response from DOD*

51.    On February 7, 2025, "A. ANDREW WHITE" at DOD received Plaintiffs' FOIA request via Federal Express, tracking number 771916558120.

52.    On February 27, 2025, DOD responded by stating that Plaintiffs' request was misdirected, and that the appropriate component agency with responsive record is "U.S. Southern Command" or "SOUTHCOM."

53.    On March 12, 2025, Plaintiffs received an acknowledgement of their FOIA request from DOD-SOUTHCOM.

54.    On April 3, 2025, Plaintiffs appealed DOD's decision to refer the FOIA request to only SOUTHCOM, and listed several other DOD components that likely have responsive records. Plaintiffs also identified in their appeal certain types of requested materials that that would like prioritized for production. A copy of this appeal is attached as Exhibit C.

55.    As of the date of this filing, Plaintiffs have received no further responses from DOD.

*Response from DOS*

56.     On February 7, 2025, "J. WASHINGTON" at DOS received Plaintiffs' FOIA request via Federal Express, tracking number 771916852174.

57.     On February 27, 2025, DOS responded by acknowledging receipt of the request but averred that it would not be able to process the request in the timeframe provided by statute due to "unusual circumstances."

58.     DOS did not respond to Plaintiffs' requests for expedited processing and a fee waiver.

59.     As of the date of this filing, Plaintiffs have received no further responses from DOS.

*Response from USCIS*

60.     On March 28, 2025, USCIS acknowledged Plaintiffs' FOIA request.

61.     In its acknowledgment, USCIS granted Plaintiffs' fee waiver request and denied Plaintiffs' request for expedited processing.

62.     On April 25, 2025, USCIS made a final determination on Plaintiffs' FOIA request, stating the agency was "unable to locate records" related to Plaintiff's request.

63.     On May 17, 2025, Plaintiffs' filed an administrative appeal of USCIS's determination.

64.     As of the date of this filing, Plaintiffs have received no further responses from USCIS.

*Response from CBP*

65.     On February 7, 2025, "J. REYES" at CBP received Plaintiffs' FOIA request via Federal Express, tracking number 771916788643.

66.     Under the statute, Defendants ordinarily have twenty working days to respond to a request. *See* 5 U.S.C. § 552(a)(6)(A)(i). More than twenty working days have passed since Plaintiffs submitted the request. To date, there has been no response from CBP.

67.     Plaintiffs have exhausted their administrative remedies with respect to the FOIA request because the Defendants have failed to comply with FOIA's time limit provisions. *See id.* § 552(a)(6)(C)(i).

## PLAINTIFFS' CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Failure to Make a Determination, Disclose and Release Responsive Records**

68.     Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if repeated and incorporated herein.

69.     By failing to make a determination on Plaintiffs' FOIA request within the mandated statutory timeframe, by failing to disclose and release the requested records, and by failing to conduct an adequate search reasonably calculated to uncover responsive records, Defendants have violated the public's right, advanced by Plaintiffs, to agency records under 5 U.S.C. §§ 552 *et seq*.

### SECOND CLAIM FOR RELIEF

**Failure to Provide Expedited Processing**

70.     Plaintiffs repeat and re-allege each and every allegation in the foregoing paragraphs as if repeated and incorporated herein.

71.     By denying or failing to respond timely to Plaintiffs' requests for expedited processing, Defendants have violated Plaintiffs' rights under § 552(a)(6)(E) and Defendants' own regulations.

### THIRD CLAIM FOR RELIEF

**Failure to Respond to Plaintiffs' Request for a Fee Waiver**

72.     Plaintiffs repeat and re-allege each and every allegation contained the foregoing as if repeated and incorporated herein.

73.     By failing to respond or failing to non-conditionally grant Plaintiffs' requests for fee waivers, Defendants DOS and CBP have denied Plaintiffs' rights under § 552(a)(4)(A)(iii) and Defendants' own regulations.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court:

1)      Declare that Defendants violated the Freedom of Information Act by failing to lawfully satisfy Plaintiffs' February 6, 2025 FOIA request;

2)      Order Defendants immediately to make a full, adequate, and expedited search for the requested records;

3)      Order Defendants to engage in expedited processing in this action;

4)      Enjoin Defendants from assessing fees or costs for the processing of the FOIA request;

5)      Order Defendants, upon completion of expedited processing, to disclose the requested records in their entirety and make copies available to Plaintiffs no later than ten days after the Court's order;

6)     Award Plaintiffs costs and reasonable attorney's fees incurred in this action as provided by 5 U.S.C. § 552(a)(4)(E); and

7)     Grant any further relief as this Court may deem just and proper.


Date:   July 29, 2025
        New York, New York

Baher Azmy
Angelo Guisado
J. Wells Dixon
Ayla Kadah*
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6445
Fax: (212) 614-6499
bazmy@ccrjustice.org

Attorneys for Plaintiffs
*Pro Hac Admission forthcoming