# EXHIBIT A

 

February 6, 2025

| | |
|---|---|
| U.S. Department of Defense<br>Freedom of Information Division<br>1155 Defense Pentagon<br>Washington, D.C. 20301-1155 | U.S. Customs Border Protection<br>FOIA Division<br>90 K Street, NE<br>Washington, DC 20229 |
| U.S. Department of Homeland Security<br>Chief FOIA Officer The Privacy Office<br>245 Murray Lane SW, Stop 0655<br>Washington, D.C. 20528-0655 | U.S. Department of State<br>Office of Information Programs & Services<br>2201 C Street N.W., Suite B266<br>Washington, D.C. 20520 |
| U.S. Immigration and Customs Enforcement<br>Freedom of Information Act Office<br>500 12th Street SW, Stop 5009<br>Washington, D.C. 20536-5009 | U.S. Citizenship and Immigration Services<br>uscis.foia@uscis.dhs.gov |

*Via Federal Express and email (USCIS)*

**Re: Freedom of Information Act Request**

To Whom it May Concern:

The Center for Constitutional Rights ("CCR"), the Haitian Bridge Alliance ("HBA"), and Detention Watch Network ("DWN") (collectively, "Requesters") submit this request pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for public records in the custody of the U.S. Department of Defense ("DOD"), the Department of Homeland Security ("DHS"), U.S. Customs and Border Protection ("CBP"), U.S. Immigration and Customs Enforcement ("ICE"), U.S. Citizenship and Immigration Services ("USCIS") and the Department of State ("DOS") for information on the reported expansion of the Migrant Operations Center ("MOC") at the United States Naval Base at Guantánamo and plans, pursuant to President Trump's January 29, 2025 Executive Order titled, "Expanding Migrant Operations Center at Naval Station Guantanamo Bay ("Guantánamo") to Full Capacity," ("Trump Guantánamo EO") to detain many thousands of migrants currently detained or residing in the territorial United States.[1]

---

[1] EO is available here: https://www.whitehouse.gov/presidential-actions/2025/01/expanding-migrant-operations-center-at-naval-station-guantanamo-bay-to-full-capacity/.

Please direct this request to all appropriate and applicable field offices, departments, components and individuals, including but not limited to: DHS's Privacy Office, DHS Office of General Counsel, DHS Office of Strategy, Policy and Plans, the U.S. Coast Guard and the DHS Office of Public Affairs; ICE's Enforcement and Removal Operations ("ERO"), all Texas ERO field offices including El Paso, ICE's Office of General Counsel, ICE Office of Principal Legal Advisor, Chief of Staff Jon Feere, White House Press Secretary Karoline Leavitt, ICE Air Transportation, ICE Office of Public Affairs; DOD components Naval Station Guantanamo Bay Cuba, United States Southern Command, United States Northern Command, Office of the Secretary of Defense Pete Hegseth, Joint Task Force-Guantanamo; Office of General Counsel, Department of the Army, Department of the Navy, Marine Corps, U.S. Coast Guard, and Air Mobility Command.

### A. Background: The Brutal and Lawless History of Detentions at Guantánamo

U.S. detention practices in Guantánamo have historically violated fundamental human rights and domestic constitutional norms. It has been a site of lawlessness, cruelty and torture rightly producing international condemnation over the years. In 1991, the United States Coast Guard interdicted thousands of refugees fleeing persecution from a military coup in Haiti in order to prevent these refugees from reaching the United States mainland where they would unambiguously access the protections of international and domestic law. Instead, the United States interned thousands of these Haitian refugees at Guantánamo, and made the legal claim that, as foreign nationals held on the putatively foreign soil of Guantánamo, the Haitians had no rights U.S. law was bound to respect. In response, Requester CCR sued federal officials in order to obtain legal access to the refugees and to affirm their entitlement to the protections of international human rights law. In addition to having limited access to rights and legal counsel, these refugees languished in horrid conditions, with insufficient access to food, water, and health care. Though these legal cases were eventually resolved via a settlement that allowed numerous refugees to enter the United States for processing, the U.S. has continued its practice of interdicting migrants encountered at sea and detaining them at Guantánamo.[2]

On November 13, 2001, President George W. Bush issued Military Order No. 1, "Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism,"[3] which authorized the Secretary of Defense to try non-citizens in military tribunals without conventional protections of military or civilian courts, including protections against evidence obtained from torture. Unlike the Executive Order issued by President Trump that is the subject of this request, President Bush claimed authority to undertake such radical action based on congressional authorization contained in the September 2001 Authorization of Use of Military Force

---

[2] International Refugee Assistance Project, *OFFSHORING HUMAN RIGHTS: Detention of Refugees at Guantánamo Bay* (Sept. 2024), available at https://refugeerights.org/wp-content/uploads/2024/09/Offshoring-Human-Rights-Guantanamo-Bay-English-Report-September-2024-1.pdf.
[3] Available at: https://fas.org/irp/offdocs/eo/mo-111301.htm.

("AUMF").[4] On January 11, 2002, the Bush Administration transported the first three dozen – of what would ultimately become 780 Muslim men and boys – individuals apprehended abroad as part of the so-called "Global War on Terror" ("GWOT").

During this GWOT, Guantánamo predominantly functioned as the largest piece in a broad policy which contemplated the indefinite, secret detention of suspected terrorists or sympathizers in the service of a global interrogation operation.[5] It created a novel legal category—the "enemy combatant"—and proclaimed that such persons were not entitled to any rights whatsoever, including basic Geneva Convention rights governing wartime captures and the mandate of humane treatment. To forestall any challenge to this novel legal regime, Administration lawyers sought to create at Guantánamo a "legal black hole," or "the legal equivalent of outer space"—explicitly outside the jurisdiction of U.S. courts.[6] The Bush Administration contended that such foreign nationals held on the asserted foreign sovereign territory in Cuba were entitled to no rights the government was bound to respect.

Denying these detainees access to counsel or to basic rights was instrumental in advancing the broader goal of conducting a broad experiment in endless, brutal interrogations,[7] and eventually harrowing reports documenting systemic torture of detainees held there became omnipresent.[8]

In February 2002, Requester CCR filed the first legal challenge to the proposed indefinite, incommunicado detention of detainees at Guantánamo in federal court, which was

---

[4] The AUMF authorized the President to use: all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001.

[5] JOSEPH MARGULIES, GUANTÁNAMO AND THE ABUSE OF PRESIDENTIAL POWER (2007).

[6] Michael Isikoff, *The Gitmo Fallout*, NEWSWEEK (July 16, 2006, 8:00 PM), https://www.newsweek.com/. *See also* Memorandum for William J. Haynes, II, General Counsel, Department of Defense, from Patrick F. Philbin & John C. Yoo, Deputy Assistant Attorneys General, Office of Legal Counsel (Dec. 28, 2001), *reprinted in* THE TORTURE PAPERS: THE ROAD TO ABU GHRAIB, 29–37 (Karen J. Greenberg & Joshua L. Dratel, eds. 2005) (stating their belief that a federal district court cannot properly exercise *habeas corpus* jurisdiction over detainees on Guantánamo because the U.S. does not have sovereignty over the island under its lease with Cuba (Agreement Between United States of America and the Republic of Cuba for the Lease to the United States of Lands in Cuba for Coaling and Naval Stations, Feb. 16-23, 1903, U.S.-Cuba, T.S. No. 418, 6 Bevans 1113 [hereinafter "lease agreement"]).

[7] Jane Mayer, *The Experiment*, NEW YORKER, July 11, 2005, at 63.

[8] *See* Neil A. Lewis, *Red Cross Finds Detainee Abuse in Guantánamo*, N.Y. Times (Nov. 30, 2004), at A1 ("investigators had found a system devised to break the will of the prisoners at Guantánamo . . . through 'humiliating acts, solitary confinement, temperature extremes, [and] use of forced positions'"); *see also Charges of Guantánamo Detainee Torture Unfounded, General Says*, State Dep't Press Releases & Documents, July 14, 2005, *available at* http://usinfo.state.gov/dhr/archive/2005/ Jul/15-641403.html (reporting that Defense Department investigation into torture at the Base was "a result of more than two-dozen e-mails from FBI personnel alleging mistreatment of detainees at Guantánamo in the second half of 2002"). UNITED NATIONS, ECONOMIC AND SOCIAL COUNCIL, COMMISSION ON HUMAN RIGHTS, *Economic, Social and Cultural Rights Civil and Political Rights*, U.N.Doc.E/CN.4/ 2006/120 (Feb. 15, 2005), *available at* http://www.ohchr.org/english/bodies/ chr/docs/62chr/E.CN.4.2006.120_.pdf (hereinafter *UN Report*) (The UN Special Rapporteur on Torture concluded that interrogation techniques used at Guantánamo, "in particular the use of dogs, exposure to extreme temperatures, sleep deprivation for several consecutive days[,] and prolonged isolation were perceived as causing severe suffering . . . [and] that the simultaneous use of these techniques is even more likely to amount to torture.").

captioned *Rasul v. Bush*, 542 U.S. 466 (2004). The case eventually reached the Supreme Court and, on June 28, 2004, the Court ruled against the Bush Administration, holding that detainees possessed rights under the habeas corpus statute in substantial part because Guantánamo was, in every practical respect, within the territorial jurisdiction of the United States.[9] With the right to challenge the legality of their detention, came an unambiguous right to retain and have meaningful access to counsel. In the subsequent years, CCR would coordinate the representation of nearly all of the 780 men detained there. Collectively, CCR lawyers have visited clients in Guantánamo over 100 times, and others have conducted thousands of client visits, while also communicating by mail and secure telephone line. Attempts to restrict counsel access to clients have been firmly rejected by federal courts.

After Congress stripped the courts of jurisdiction to hear statutory habeas petitions (effectively overruling *Rasul*), the Supreme Court in 2008 held that detainees held at Guantánamo possessed *constitutional* rights to habeas corpus protected by the Suspension Clause, which Congress could not constitutionally abrogate or diminish.[10] The Court further held that detainees were entitled to "meaningful" habeas review of their detentions in the federal courts.[11]

Indeed, after more than two decades of federal court litigation as well as military commission proceedings concerning Guantánamo, the law is clearly established that Guantánamo detainees are entitled to robust and meaningful access to legal counsel, which continues for at least as long as an individual remains there. Counsel access includes, but is not limited to, unmonitored, privileged and confidential attorney-client communications via written legal mail, telephone calls, videoconferencing, and, most importantly, in-person, face-to-face meetings at Guantánamo. Counsel access to Guantánamo is also facilitated via U.S. military aircraft, including contract airlines, and lodging and transportation are afforded by the U.S. government to counsel visiting their detainee clients. Detainees are also able to communicate with their families by telephone and videoconference, and are afforded confidential, unmonitored meetings with representatives of the International Committee of the Red Cross.

Critically, no one has ever been transferred from the territorial United States (where they would presumptively enjoy full constitutional rights) to Guantánamo. This is so, even as various administrations have transferred or repatriated a total of 750 formerly detained individuals. Indeed, three presidential administrations – George W. Bush, Barack Obama and Joe Biden – have acknowledged the damage Guantánamo has done to the United States' reputation as a guardian of human rights and the rule of law and have called for its closure. In shocking contrast, the Trump Guantánamo EO contemplates, for the first time in nearly twenty years, that individuals would be transferred or detained in Guantánamo. For anyone transferred from inside the United States to the U.S. Naval Base in Guantánamo, their rights to due process are even stronger than those currently available to individuals who had previously been transferred there from foreign countries. The Trump Administration's threat to transfer up to 30,000 migrants to

---

[9]     *Rasul v. Bush*, 542 U.S. 466, 480 (2004).
[10]    *Boumediene v. Bush*, 553 U.S. 723, 771 (2008).
[11]    *Id.* at 779.

Guantánamo comes in the face of prior statements by President Trump, in 2019, that Guantánamo was a waste, because "it costs a fortune to operate and I think it's crazy."[12]

### B. Purpose of Request

As the foregoing demonstrates, the legal status of Guantánamo and the treatment and rights of individuals detained there is a controversy of the most profound and immediate importance. That the Trump Administration would seek to populate Guantánamo – an internationally recognized symbol of lawlessness and brutality – is a remarkable and dangerous course of action. As organizations who have worked over the past several presidential administrations to protect the rights of individuals detained at Guantánamo and the rights of immigrant populations more broadly, Requesters are gravely concerned that the agencies responsible for implementing the Trump Guantánamo EO will not faithfully comply with legal requirements governing the detention of any persons there, will not grant full access to counsel to meet with immigration-detainee clients, and will not have made adequate provisions to ensure the safety and health of individuals detained there.

The need for transparency regarding the implementation of this EO is of absolute urgency, as immigrants have already begun being transferred to the base.[13] Sources familiar with the plan have stated that the administration has not resolved important issues regarding the legal status of individuals transferred to Guantánamo.[14] Of particular concern to Requesters and advocates of individuals who might be detained are:

> (i) What criteria will be used to select and send migrants from the United States or other locations to detention in Guantánamo?
>
> (ii) Will individuals selected and sent to Guantánamo be in the midst of immigration proceedings and at what stage of their proceedings will they be?
>
> (iii) What anticipated legal process will be available to individuals detained there and will the Trump Administration comply with strictures of due process and other constitutional, statutory, and regulatory requirements mandated by US law?
>
> (iv) What concrete provisions to accommodate lawyer access – both in person and remotely given Guantánamo's remote location – will be made available?

---

[12]     Peter Baker, *Trump Says 'It's Crazy' to Spend $13 Million Per Inmate at Guantánamo*, N.Y. Times (Sept. 19, 2019), https://www.nytimes.com/2019/09/19/us/politics/trump-guantanamo.html.
[13]     Camilo Montoya-Galvez, Eleanor Watson, *Trump administration sends first group of migrant detainees to Guantanamo Bay*, CBS News (Feb. 5, 2025), https://www.cbsnews.com/news/trump-guantanamo-bay-migrant-detainees/.
[14]     Priscilla Alvarez, Natasha Bertrand and Haley Britzky, *Migrant flight lands in Guantanamo Bay as legal questions swirl around Trump plans*, CNN (Feb. 4, 2025), https://www.cnn.com/2025/02/04/politics/guantanamo-migrant-flight/index.html.

C. **Definitions**

- **Record(s).** In this request the term "record(s)" includes, but is not limited to, all Records or communications preserved in electronic (including metadata) or written form, such as correspondences, emails, documents, data, videotapes, audio tapes, faxes, files, guidance, guidelines, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, legal opinions, protocols, reports, rules, talking points, technical manuals, technical specifications, training manuals, studies, or any other Record of any kind.
- **Communication(s).** In this request the term "communication" means the transmittal of information (in the forms of facts, ideas, inquiries or otherwise), including but not limited to emails, texts, and/or any other type of electronic communication.
- **Guantánamo**: In this request the term "Guantánamo" refers to the United States Naval Station at Guantánamo Bay, Cuba, also known as Naval Station Guantánamo Bay, NSGB, GTMO, or Gitmo.
- **Guantánamo EO:** The January 29, 2025 Executive Order "Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity" attached as Exhibit 1.
- **Migrant Operations Center:** A facility in Guantánamo Bay, Cuba, where the United States has detained refugees encountered at sea.
- **Migrants:** The term "migrants" refers to those individuals in detention in the territorial United States who have been and will be transferred and detained at Guantánamo pursuant to the Guantánamo EO.

D. **Request for Information**

We request the following records beginning on January 20, 2025, from all of the above-listed agencies through when searches commence:

Policies, Guidance, Legal Memoranda

1. All guidance, policies, procedures and legal memoranda/opinion related to criteria the agencies and components have used and will use to determine which persons will be transferred from the territorial United States for detention at Guantánamo.

2. All guidance, policies, procedures and legal memoranda/opinion addressing or related to the proposed status of migrants who are and will be detained at Guantánamo and what legal rights and processes those individuals will be afforded.

6

3. All guidance, policies, procedures and legal memoranda/opinion addressing or related to whether and to what extent existing or potential legal counsel will have access to migrants who are and will be detained at Guantánamo.

4. All guidance, policies, procedures and legal memoranda/opinion addressing the treatment and conditions of migrants who are and will be detained at Guantánamo, including but not limited to the provision of shelter, hygiene, clothing and bedding, food and water, religious practice, recreation, and health care to those individuals.

5. All guidance, policies, procedures and legal memoranda/opinion addressing whether and by what means migrants who are and will be detained at Guantánamo will be permitted to communicate with their family members, and whether and to what extent members of the media and press will be permitted access to those detained and/or the detention facilities.

Communications

6. All internal communications within agency personnel at leadership roles within each agency related to the Guantánamo EO.

7. All communications between the White House and agency personnel at leadership roles within each agency related to the Guantánamo EO.

Data and Planning Documents

8. A list of all persons detained or designated for detention at the MOC, including their Name, Age, Gender, Status of Immigration Proceedings, and Country of Origin.

9. Any records related to the logistics of implementing the Guantánamo EO, including staffing plans, lists of external contractors, budgetary documents including cost estimates, and potential funding sources.

Please search for responsive records regardless of format, medium, or physical characteristics, and including electronic records. Please provide the requested documents in the following format:

- In PDF format wherever possible;
- Electronically searchable wherever possible;
- Each paper record in a separately saved file;
- "Parent-child" relationships maintained, meaning that the Requestor must be able to identify the attachments with emails;
- Any data records in native format (i.e. Excel spreadsheets in Excel);

- Emails should include BCC and any other hidden fields; and
- With any other metadata preserved.

### E. Requesters

The **Center for Constitutional Right**s ("CCR") is a non-profit, public interest legal and advocacy organization that engages in the fields of civil and international human rights. CCR's diverse issue areas include litigation and advocacy around immigration, as well as racial and ethnic profiling. One of CCR's primary activities is the publication of newsletters, know-your-rights handbooks, legal analysis of current immigration law issues, and other similar materials for public dissemination. These and other materials are available through CCR's Development, Communications, and Advocacy Departments. CCR operates a website, http://ccrjustice.org, which addresses the issues on which CCR works. CCR staff members often serve as sources for journalists and media outlets, including on issues related to racial justice, racial discrimination, and immigrant rights. In addition, CCR regularly issues press releases, has an active social media presence with thousands of followers, and issues regular email updates sent to over 50,000 supporters about developments and news pertaining to CCR's work.

**Detention Watch Network** ("DWN") is a national coalition of organizations and individuals working to expose and challenge the injustices of the U.S. immigration detention and deportation system and advocate for profound change that promotes the rights and dignity of all persons. DWN was founded in 1997 in response to the explosive growth of the immigration detention and deportation system in the United States. Today, DWN is the only national network that focuses exclusively on immigration detention and deportation issues. The Network is recognized as the "go-to" resource on detention issues by media and policymakers and known as a critical national advocate for just policies that promote an eventual end to immigration detention. As a member-led network, we unite diverse constituencies to advance the civil and human rights of those impacted by the immigration detention and deportation system through collective advocacy, public education, communications, and field and network-building. DWN has a well-known website featuring the latest news, information and developments on detention policy.

**Haitian Bridge Alliance** ("HBA") is a grassroots and community-based non-profit organization that advocates for fair and humane immigration policies and provides migrants and immigrants with humanitarian, legal, and social services, with a particular focus on Black migrants, the Haitian community, women and girls, LGBTQIA+ individuals, and survivors of torture and other human rights abuses. HBA regularly organizes Know Your Rights presentations, legal orientation trainings, and the recording and dissemination of explanatory videos for migrants in the United States and for those on the Mexico side of the U.S. border. HBA regularly takes new information learned and devise new Know Your Rights programs so that people in the United States and those attempting to enter the United States, including those

stranded in Mexico for extended periods, understand the new policy. HBA regularly disseminates information learned to international human rights mechanisms through reporting on the U.S.'s compliance with its human rights obligations, with a focus on U.S. border policies and their impact on Black people in transnational migration. HBA operates a website, https://haitianbridgealliance.org/, which addresses the issues on which HBA works. HBA staff members often serve as sources for journalists and media outlets, including on issues related to immigration, racial justice, U.S. policy towards Haiti and Haitian migrants, and immigrant rights. In addition, HBA regularly issues press releases, has an active social media presence where it regularly provides updates about developments and news pertaining to HBA's work.

### F. Fee Waiver

The Requesters are entitled to a fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(iii), 22 CFR § 171.16(a), 32 CFR § 286.12(l) and 6 C.F.R. § 5.11(k) on the grounds that "disclosure of the requested records is in the public interest because it is likely to contribute significantly to the public understanding of the activities or operations of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii). The Requester meets the requirements for a fee waiver because the subject of this request concerns the operations or activities of the government, the disclosure of the information is likely to contribute to a significant public understanding of government operations or activities, the Requester's primary interest is in disclosure, and the Requester has no commercial interest in the information. *See* 22 C.F.R. § 171.16. All Requesters have a track-record of publicizing and explaining government records received through FOIA.

The need for information related to the MOC and this specific EO is immediate and vital to tens of thousands of people, most importantly immigrants and their family members. Requesters seek relevant documents in order to gain critical information about the circumstances, plans, asserted legal authority to take such an extraordinary step to militarily detain individuals in the world's most notorious prison facility. Information about this unprecedented action is necessary for public understanding of the administration's plans and its compliance/non-compliance with its legal obligations. It is also critical for advocates like Requesters, so they can understand how best to protect the rights and safety of immigrants affected by the Guantánamo EO.

Disclosure in this case therefore meets the statutory criteria, and a fee waiver would fulfill Congress' legislative intent in amending FOIA. *See Judicial Watch Inc. v. Rossotti*, 326 F.3d 1309 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be liberally construed in favor of waivers of noncommercial requesters.") (citations omitted).

In the alternative, if no fee waiver is granted and the fees exceed $50.00, please contact the Requester's undersigned representative to obtain consent to incur additional fees. Processing

fees should be limited pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) ("[F]ees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by . . . a representative of the news media").

### G. Expedited Processing

Requesters are entitled to expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E); 32 C.F.R. § 286.8(e)(1)(i), (e)(1)(ii)(B), and (e)(3); 22 C.F.R. § 171.11(f)(1)-(4); and 6 C.F.R. § 5.5(e)(1)(i)-(ii) on the ground that there is an immediate and compelling need for the information.

Requesters' primary professional activities is information dissemination, and there is an urgent need to inform the public about why such a tremendous policy decision was made, and even more importantly, how it could affect thousands of people living in the U.S. 22 C.F.R. § 171.11(f)(2) and 6 C.F.R. § 5.5(e)(1)(ii). As of this FOIA request, there is scarce information available to the public as to how any transfers of people to the Guantánamo base would work or when they would begin, with U.S. government officials saying little to nothing publicly as to the implementation of the EO. As a result, immediate access to the requested records by Requesters[15] is crucial.

Critically, not obtaining the records on an expedited basis could pose an imminent threat to the life or physical safety of any person designated to be held at the MOC, 32 C.F.R. §286.8(e)(1)(i), 22 C.F.R. § 171.11(f)(1), and 6 C.F.R. § 5.5(e)(1)(i), and could also be expected to harm substantial humanitarian interests, 32 C.F.R. § 286.8(e)(1)(ii)(B) and 22 C.F.R. § 171.11(f)(3). As of the date of this request, migrants have already begun being sent from the U.S. to the Guantánamo base.[16] There exists virtually no information about how those sent to Guantánamo are being selected, who they are, or what conditions they are being held during transport or while at the base. A former State Department official has called the transfers "insane,"[17] and the transfers have been covered by media outlets nationally and internationally.[18]

---

[15] As laid out above, dissemination of information for the public good is a key component of the work of each of the Requesters, all of whom regularly publish information such as reports, newsletters and other updates to their membership and the general public.

[16] Ellen Mitchel, *10 'high-threat' migrants now at Guantanamo Bay: Pentagon*, The Hill (Feb. 5, 2025), https://thehill.com/policy/defense/5128305-migrants-guantanamo-bay-pentagon-trump-immigration-crackdown-dod-dhs/.

[17] Ben Fox, *'Frankly Insane': Trump's Plan to Ship Migrants to Guantanamo Could Quickly Collapse*, Politico (Feb. 5, 2025), https://www.politico.com/news/magazine/2025/02/05/frankly-insane-trumps-plan-to-ship-migrants-to-guantanamo-could-quickly-collapse-00202374.

[18] Maia Davies, *Trump sends first migrant detainees to Guantanamo Bay*, BBC News (Feb. 5, 2025), https://www.bbc.com/news/articles/cy0p1ykxyzjo.

Accordingly, Requesters expect an expedited processing determination within 10 days of the receipt of this FOIA request, pursuant to 32 C.F.R. § 286.8(e)(1), 22 C.F.R. § 171.11(f)(4), and 6 C.F.R. § 5.5(e)(4).

**Conclusion**

Requesters expect each agency to make a determination on this request within 20 days, as provided by statute. *See* 5 U.S.C. § 552(a)(6)(A)(i). If our request is denied, in whole or in part, we ask that each agency justify all deletions by reference to specific exemptions to FOIA. We also expect each agency to release all segregable portions of otherwise exempt material.

Thank you for your prompt attention to this matter. Please furnish all applicable records to: Ian Head, Center for Constitutional Rights, at **ihead@ccrjustice.org (*preferred*)** or by mail at PO Box 1606, San Pedro, CA 90733.

I certify that the above information is true and correct to the best of my knowledge.

Thank you,

Ian Head
Open Records Project Manager
Center for Constitutional Rights

11

# EXHIBIT 1

Menu  Search

PRESIDENTIAL ACTIONS

# EXPANDING MIGRANT OPERATIONS CENTER AT NAVAL STATION GUANTANAMO BAY TO FULL CAPACITY

January 29, 2025

MEMORANDUM FOR THE SECRETARY OF DEFENSE THE SECRETARY OF HOMELAND SECURITY

SUBJECT: 	Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity

I hereby direct the Secretary of Defense and the Secretary of Homeland Security to take all appropriate actions to expand the Migrant Operations Center at Naval Station Guantanamo Bay to full capacity to provide additional detention space for high-priority criminal aliens unlawfully present in the United States, and to address attendant immigration enforcement needs identified by the Department of Defense and the Department of Homeland Security.

This memorandum is issued in order to halt the border invasion, dismantle criminal cartels, and restore national sovereignty.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

News

Administration

Issues

Contact

THE WHITE HOUSE

1600 Pennsylvania Ave NW

Washington, DC 20500

THE WHITE HOUSE

WH.GOV

Copyright

Privacy