# EXHIBIT C



April 3, 2025

*Via email to osd.foia.appeal@mail.mil*

**Re: 25-F-2337 – FOIA Appeal**

Dear FOIA Officer:

Pursuant to 32 CFR § 286.11, the Haitian Bridge Alliance, Detention Watch Network, and the Center for Constitutional Rights (collectively, "the Requesters") appeal the U.S. Department of Defense's ("DOD") determination to transfer their FOIA request (25-F-2337) to U.S. Southern Command ("SOUTHCOM").

This FOIA request, submitted on February 6, 2025[1], sought information relating to the federal government's reported detention of migrants at Naval Station Guantánamo Bay ("Guantánamo") pursuant to President Trump's January 29, 2025 Executive Order titled, "Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity," ("Guantánamo EO"). This included plans, pursuant to the Guantánamo EO to detain thousands of migrants currently detained or residing in the territorial United States.[2] Specifically, Requesters sought (1) all guidance, policies, and legal memoranda relating to the criteria used to determine which persons will be transferred to Guantánamo, detention conditions at Guantánamo, and detainees' rights and access to legal counsel, family members, and the press; (2) communications within certain agencies and with the White House related to the Guantánamo EO; (3) a list of all persons detained or designated for detention at the MOC; and (4) any records related to the logistics of implementing the Guantánamo EO.[3]

By letter dated February 27, 2025, DOD acknowledged receipt of the FOIA request and transferred the entire request to SOUTHCOM which, according to the letter, "would have cognizance over the information . . . requested."[4]

Although SOUTHCOM is a relevant component[5] and should be searched, DOD's decision to transfer the entire request to only SOUTHCOM is erroneous and should be reversed. For instance, as government declarations recently filed in other federal litigation[6] demonstrate, such

---

[1] *See* Exhibit A, FOIA Request.
[2] *See id.*
[3] *See id.* at 6–7.
[4] *See* Exhibit B, DOD Letter.
[5] On March 12, 2025, Requesters received a separate response to our FOIA from SOUTHCOM, with the FOIA # SC-25-032-S.
[6] *See* Exhibit C, Declaration of Colonel Jennifer Venghaus ("Venghaus Decl."); Exhibit D, Declaration of Lieutenant Colonel Robert Green ("Green Decl.").

detentions now include the Migrant Operations Center ("MOC") and the Windward High Threat Illegal Alien Holding Facility (also known as "Camp VI") at Guantánamo, and potentially involve other DOD components and offices as well.

Specifically, the request should be transferred to the following DOD components[7], which are referenced in the recently-filed government declarations:

1. The Office of the Secretary of Defense ("OSD"), which is charged with assisting the Secretary of Defense in carrying out the Secretary's duties and responsibilities. *See* 10 U.S.C. § 131. The Secretary is among the officials tasked with carrying out the Trump Guantánamo EO.

2. The Office of the General Counsel ("OGC"), which is charged with providing legal advice to the Secretary of Defense and other DOD officials. *See* 10 U.S.C. § 140. Given the legal uncertainties surrounding transfers of migrants to Guantánamo, OGC is highly likely to possess documents relevant to this FOIA request.

3. Joint Task Force-Guantanamo ("JTF-GTMO") which, since 2002, has been responsible for the custody of law of armed conflict detainees, as well as supporting ongoing military commission proceedings and other processes involving those detainees.[8]

4. Joint Task Force-Southern Guard ("JTF-SG"), which was created in response to Secretary Hegseth's January 30, 2025, order to SOUTHCOM to expand migration operations at Guantánamo.[9]

5. Task Force Guardian, which supports the JTF-SG at Guantánamo and is responsible for safeguarding and controlling detainees under the direction of and in support of the Department of Homeland Security ("DHS") and Immigration and Customs Enforcement ("ICE").[10]

Finally, the Requesters specifically highlight these records for production by DOD components:

1. Any memorandum of understanding between Joint Task Force-Guantanamo and Joint Task Force-Southern Guard concerning detainee operations at Guantánamo;

2. Any memorandum of understanding between DHS and/or ICE and/or Enforcement and Removal Operations, and DOD and/or JTF-GTMO and/or JTF-SG and/or Task Force Guardian concerning detainee operations at Guantánamo;

---

[7] In addition to the priority components listed, as Requesters stated in our FOIA Request, we ask that DOD also search United States Northern Command, Department of the Army, Department of the Navy, Marine Corps, U.S. Coast Guard, and Air Mobility Command, as well as any other appropriate offices and/or custodians who may have responsive records.
[8] Exhibit C, Venghaus Decl. at 2.
[9] *Id.* at 3.
[10] Exhibit D, Green Decl. at 2.

3.  Any standard operating procedures implementing any such memorandum of understanding; and

4.  Any records referencing Posse Comitatus and detainee operations at Guantánamo.

DOD should reverse its decision to transfer this request to only SOUTHCOM and instead additionally transfer it to OSD, OGC, JTF-SG, and Task Force Guardian.

I look forward to your response within 20 working days as required by 32 CFR § 286.11. Please do not hesitate to contact me at ihead@ccrjustice.org if you have any questions.

Sincerely,

Ian Head
Open Records Project Manager
Center for Constitutional Rights

# EXHIBIT A

 

February 6, 2025

U.S. Department of Defense
Freedom of Information Division
1155 Defense Pentagon
Washington, D.C. 20301-1155

U.S. Customs Border Protection
FOIA Division
90 K Street, NE
Washington, DC 20229

U.S. Department of Homeland Security
Chief FOIA Officer The Privacy Office
245 Murray Lane SW, Stop 0655
Washington, D.C. 20528-0655

U.S. Department of State
Office of Information Programs & Services
2201 C Street N.W., Suite B266
Washington, D.C. 20520

U.S. Immigration and Customs Enforcement
Freedom of Information Act Office
500 12th Street SW, Stop 5009
Washington, D.C. 20536-5009

U.S. Citizenship and Immigration Services
uscis.foia@uscis.dhs.gov

*Via Federal Express and email (USCIS)*

**Re: Freedom of Information Act Request**

To Whom it May Concern:

The Center for Constitutional Rights ("CCR"), the Haitian Bridge Alliance ("HBA"), and Detention Watch Network ("DWN") (collectively, "Requesters") submit this request pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for public records in the custody of the U.S. Department of Defense ("DOD"), the Department of Homeland Security ("DHS"), U.S. Customs and Border Protection ("CBP"), U.S. Immigration and Customs Enforcement ("ICE"), U.S. Citizenship and Immigration Services ("USCIS") and the Department of State ("DOS") for information on the reported expansion of the Migrant Operations Center ("MOC") at the United States Naval Base at Guantánamo and plans, pursuant to President Trump's January 29, 2025 Executive Order titled, "Expanding Migrant Operations Center at Naval Station Guantanamo Bay ("Guantánamo") to Full Capacity," ("Trump Guantánamo EO") to detain many thousands of migrants currently detained or residing in the territorial United States.[1]

---

[1]    EO is available here: https://www.whitehouse.gov/presidential-actions/2025/01/expanding-migrant-operations-center-at-naval-station-guantanamo-bay-to-full-capacity/.

Please direct this request to all appropriate and applicable field offices, departments, components and individuals, including but not limited to: DHS's Privacy Office, DHS Office of General Counsel, DHS Office of Strategy, Policy and Plans, the U.S. Coast Guard and the DHS Office of Public Affairs; ICE's Enforcement and Removal Operations ("ERO"), all Texas ERO field offices including El Paso, ICE's Office of General Counsel, ICE Office of Principal Legal Advisor, Chief of Staff Jon Feere, White House Press Secretary Karoline Leavitt, ICE Air Transportation, ICE Office of Public Affairs; DOD components Naval Station Guantanamo Bay Cuba, United States Southern Command, United States Northern Command, Office of the Secretary of Defense Pete Hegseth, Joint Task Force-Guantanamo; Office of General Counsel, Department of the Army, Department of the Navy, Marine Corps, U.S. Coast Guard, and Air Mobility Command.

### A. Background: The Brutal and Lawless History of Detentions at Guantánamo

U.S. detention practices in Guantánamo have historically violated fundamental human rights and domestic constitutional norms. It has been a site of lawlessness, cruelty and torture rightly producing international condemnation over the years. In 1991, the United States Coast Guard interdicted thousands of refugees fleeing persecution from a military coup in Haiti in order to prevent these refugees from reaching the United States mainland where they would unambiguously access the protections of international and domestic law. Instead, the United States interned thousands of these Haitian refugees at Guantánamo, and made the legal claim that, as foreign nationals held on the putatively foreign soil of Guantánamo, the Haitians had no rights U.S. law was bound to respect. In response, Requester CCR sued federal officials in order to obtain legal access to the refugees and to affirm their entitlement to the protections of international human rights law. In addition to having limited access to rights and legal counsel, these refugees languished in horrid conditions, with insufficient access to food, water, and health care. Though these legal cases were eventually resolved via a settlement that allowed numerous refugees to enter the United States for processing, the U.S. has continued its practice of interdicting migrants encountered at sea and detaining them at Guantánamo.[2]

On November 13, 2001, President George W. Bush issued Military Order No. 1, "Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism,"[3] which authorized the Secretary of Defense to try non-citizens in military tribunals without conventional protections of military or civilian courts, including protections against evidence obtained from torture. Unlike the Executive Order issued by President Trump that is the subject of this request, President Bush claimed authority to undertake such radical action based on congressional authorization contained in the September 2001 Authorization of Use of Military Force

---

[2]      International Refugee Assistance Project, *OFFSHORING HUMAN RIGHTS: Detention of Refugees at Guantánamo Bay* (Sept. 2024), available at https://refugeerights.org/wp-content/uploads/2024/09/Offshoring-Human-Rights-Guantanamo-Bay-English-Report-September-2024-1.pdf.

[3]      Available at: https://fas.org/irp/offdocs/eo/mo-111301.htm.

2

("AUMF").[4] On January 11, 2002, the Bush Administration transported the first three dozen – of what would ultimately become 780 Muslim men and boys – individuals apprehended abroad as part of the so-called "Global War on Terror" ("GWOT").

During this GWOT, Guantánamo predominantly functioned as the largest piece in a broad policy which contemplated the indefinite, secret detention of suspected terrorists or sympathizers in the service of a global interrogation operation.[5] It created a novel legal category—the "enemy combatant"—and proclaimed that such persons were not entitled to any rights whatsoever, including basic Geneva Convention rights governing wartime captures and the mandate of humane treatment. To forestall any challenge to this novel legal regime, Administration lawyers sought to create at Guantánamo a "legal black hole," or "the legal equivalent of outer space"—explicitly outside the jurisdiction of U.S. courts.[6] The Bush Administration contended that such foreign nationals held on the asserted foreign sovereign territory in Cuba were entitled to no rights the government was bound to respect.

Denying these detainees access to counsel or to basic rights was instrumental in advancing the broader goal of conducting a broad experiment in endless, brutal interrogations,[7] and eventually harrowing reports documenting systemic torture of detainees held there became omnipresent.[8]

In February 2002, Requester CCR filed the first legal challenge to the proposed indefinite, incommunicado detention of detainees at Guantánamo in federal court, which was

---

[4]     The AUMF authorized the President to use: all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001.

[5]     JOSEPH MARGULIES, GUANTÁNAMO AND THE ABUSE OF PRESIDENTIAL POWER (2007).

[6]     Michael Isikoff, *The Gitmo Fallout*, NEWSWEEK (July 16, 2006, 8:00 PM), https://www.newsweek.com/. *See also* Memorandum for William J. Haynes, II, General Counsel, Department of Defense, from Patrick F. Philbin & John C. Yoo, Deputy Assistant Attorneys General, Office of Legal Counsel (Dec. 28, 2001), *reprinted in* THE TORTURE PAPERS: THE ROAD TO ABU GHRAIB, 29–37 (Karen J. Greenberg & Joshua L. Dratel, eds. 2005) (stating their belief that a federal district court cannot properly exercise *habeas corpus* jurisdiction over detainees on Guantanamo because the U.S. does not have sovereignty over the island under its lease with Cuba (Agreement Between United States of America and the Republic of Cuba for the Lease to the United States of Lands in Cuba for Coaling and Naval Stations, Feb. 16-23, 1903, U.S.-Cuba, T.S. No. 418, 6 Bevans 1113 [hereinafter "lease agreement"]).

[7]     Jane Mayer, *The Experiment*, NEW YORKER, July 11, 2005, at 63.

[8]     *See* Neil A. Lewis, *Red Cross Finds Detainee Abuse in Guantánamo*, N.Y. Times (Nov. 30, 2004), at A1 ("investigators had found a system devised to break the will of the prisoners at Guantánamo . . . through 'humiliating acts, solitary confinement, temperature extremes, [and] use of forced positions'"); *see also Charges of Guantánamo Detainee Torture Unfounded, General Says*, State Dep't Press Releases & Documents, July 14, 2005, *available at* http://usinfo.state.gov/dhr/archive/2005/ Jul/15-641403.html (reporting that Defense Department investigation into torture at the Base was "a result of more than two-dozen e-mails from FBI personnel alleging mistreatment of detainees at Guantánamo in the second half of 2002"). UNITED NATIONS, ECONOMIC AND SOCIAL COUNCIL, COMMISSION ON HUMAN RIGHTS, *Economic, Social and Cultural Rights Civil and Political Rights*, U.N.Doc.E/CN.4/ 2006/120 (Feb. 15, 2005), *available at* http://www.ohchr.org/english/bodies/ chr/docs/62chr/E.CN.4.2006.120__.pdf (hereinafter *UN Report*) (The UN Special Rapporteur on Torture concluded that interrogation techniques used at Guantánamo, "in particular the use of dogs, exposure to extreme temperatures, sleep deprivation for several consecutive days[,] and prolonged isolation were perceived as causing severe suffering . . . [and] that the simultaneous use of these techniques is even more likely to amount to torture.").

captioned *Rasul v. Bush*, 542 U.S. 466 (2004). The case eventually reached the Supreme Court and, on June 28, 2004, the Court ruled against the Bush Administration, holding that detainees possessed rights under the habeas corpus statute in substantial part because Guantánamo was, in every practical respect, within the territorial jurisdiction of the United States.[9] With the right to challenge the legality of their detention, came an unambiguous right to retain and have meaningful access to counsel. In the subsequent years, CCR would coordinate the representation of nearly all of the 780 men detained there. Collectively, CCR lawyers have visited clients in Guantánamo over 100 times, and others have conducted thousands of client visits, while also communicating by mail and secure telephone line. Attempts to restrict counsel access to clients have been firmly rejected by federal courts.

After Congress stripped the courts of jurisdiction to hear statutory habeas petitions (effectively overruling *Rasul*), the Supreme Court in 2008 held that detainees held at Guantánamo possessed *constitutional* rights to habeas corpus protected by the Suspension Clause, which Congress could not constitutionally abrogate or diminish.[10] The Court further held that detainees were entitled to "meaningful" habeas review of their detentions in the federal courts.[11]

Indeed, after more than two decades of federal court litigation as well as military commission proceedings concerning Guantánamo, the law is clearly established that Guantánamo detainees are entitled to robust and meaningful access to legal counsel, which continues for at least as long as an individual remains there. Counsel access includes, but is not limited to, unmonitored, privileged and confidential attorney-client communications via written legal mail, telephone calls, videoconferencing, and, most importantly, in-person, face-to-face meetings at Guantánamo. Counsel access to Guantánamo is also facilitated via U.S. military aircraft, including contract airlines, and lodging and transportation are afforded by the U.S. government to counsel visiting their detainee clients. Detainees are also able to communicate with their families by telephone and videoconference, and are afforded confidential, unmonitored meetings with representatives of the International Committee of the Red Cross.

Critically, no one has ever been transferred from the territorial United States (where they would presumptively enjoy full constitutional rights) to Guantánamo. This is so, even as various administrations have transferred or repatriated a total of 750 formerly detained individuals. Indeed, three presidential administrations – George W. Bush, Barack Obama and Joe Biden – have acknowledged the damage Guantánamo has done to the United States' reputation as a guardian of human rights and the rule of law and have called for its closure. In shocking contrast, the Trump Guantánamo EO contemplates, for the first time in nearly twenty years, that individuals would be transferred or detained in Guantánamo. For anyone transferred from inside the United States to the U.S. Naval Base in Guantánamo, their rights to due process are even stronger than those currently available to individuals who had previously been transferred there from foreign countries. The Trump Administration's threat to transfer up to 30,000 migrants to

---

[9]     *Rasul v. Bush*, 542 U.S. 466, 480 (2004).
[10]    *Boumediene v. Bush*, 553 U.S. 723, 771 (2008).
[11]    *Id.* at 779.

Guantánamo comes in the face of prior statements by President Trump, in 2019, that Guantánamo was a waste, because "it costs a fortune to operate and I think it's crazy."[12]

## B. Purpose of Request

As the foregoing demonstrates, the legal status of Guantánamo and the treatment and rights of individuals detained there is a controversy of the most profound and immediate importance. That the Trump Administration would seek to populate Guantánamo – an internationally recognized symbol of lawlessness and brutality – is a remarkable and dangerous course of action. As organizations who have worked over the past several presidential administrations to protect the rights of individuals detained at Guantánamo and the rights of immigrant populations more broadly, Requesters are gravely concerned that the agencies responsible for implementing the Trump Guantánamo EO will not faithfully comply with legal requirements governing the detention of any persons there, will not grant full access to counsel to meet with immigration-detainee clients, and will not have made adequate provisions to ensure the safety and health of individuals detained there.

The need for transparency regarding the implementation of this EO is of absolute urgency, as immigrants have already begun being transferred to the base.[13] Sources familiar with the plan have stated that the administration has not resolved important issues regarding the legal status of individuals transferred to Guantánamo.[14] Of particular concern to Requesters and advocates of individuals who might be detained are:

(i) What criteria will be used to select and send migrants from the United States or other locations to detention in Guantánamo?

(ii) Will individuals selected and sent to Guantánamo be in the midst of immigration proceedings and at what stage of their proceedings will they be?

(iii) What anticipated legal process will be available to individuals detained there and will the Trump Administration comply with strictures of due process and other constitutional, statutory, and regulatory requirements mandated by US law?

(iv) What concrete provisions to accommodate lawyer access – both in person and remotely given Guantánamo's remote location – will be made available?

---

[12] Peter Baker, *Trump Says 'It's Crazy' to Spend $13 Million Per Inmate at Guantánamo*, N.Y. Times (Sept. 19, 2019), https://www.nytimes.com/2019/09/19/us/politics/trump-guantanamo.html.

[13] Camilo Montoya-Galvez, Eleanor Watson, *Trump administration sends first group of migrant detainees to Guantanamo Bay*, CBS News (Feb. 5, 2025), https://www.cbsnews.com/news/trump-guantanamo-bay-migrant-detainees/.

[14] Priscilla Alvarez, Natasha Bertrand and Haley Britzky, *Migrant flight lands in Guantanamo Bay as legal questions swirl around Trump plans*, CNN (Feb. 4, 2025), https://www.cnn.com/2025/02/04/politics/guantanamo-migrant-flight/index.html.

**C.  Definitions**

- **Record(s).** In this request the term "record(s)" includes, but is not limited to, all Records or communications preserved in electronic (including metadata) or written form, such as correspondences, emails, documents, data, videotapes, audio tapes, faxes, files, guidance, guidelines, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, legal opinions, protocols, reports, rules, talking points, technical manuals, technical specifications, training manuals, studies, or any other Record of any kind.
- **Communication(s).** In this request the term "communication" means the transmittal of information (in the forms of facts, ideas, inquiries or otherwise), including but not limited to emails, texts, and/or any other type of electronic communication.
- **Guantánamo**: In this request the term "Guantánamo" refers to the United States Naval Station at Guantánamo Bay, Cuba, also known as Naval Station Guantanamo Bay, NSGB, GTMO, or Gitmo.
- **Guantánamo EO:** The January 29, 2025 Executive Order "Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity" attached as Exhibit 1.
- **Migrant Operations Center:** A facility in Guantánamo Bay, Cuba, where the United States has detained refugees encountered at sea.
- **Migrants:** The term "migrants" refers to those individuals in detention in the territorial United States who have been and will be transferred and detained at Guantánamo pursuant to the Guantánamo EO.

**D.  Request for Information**

We request the following records beginning on January 20, 2025, from all of the above-listed agencies through when searches commence:

Policies, Guidance, Legal Memoranda

1. All guidance, policies, procedures and legal memoranda/opinion related to criteria the agencies and components have used and will use to determine which persons will be transferred from the territorial United States for detention at Guantánamo.

2. All guidance, policies, procedures and legal memoranda/opinion addressing or related to the proposed status of migrants who are and will be detained at Guantánamo and what legal rights and processes those individuals will be afforded.

6

3.  All guidance, policies, procedures and legal memoranda/opinion addressing or related to whether and to what extent existing or potential legal counsel will have access to migrants who are and will be detained at Guantánamo.

4.  All guidance, policies, procedures and legal memoranda/opinion addressing the treatment and conditions of migrants who are and will be detained at Guantánamo, including but not limited to the provision of shelter, hygiene, clothing and bedding, food and water, religious practice, recreation, and health care to those individuals.

5.  All guidance, policies, procedures and legal memoranda/opinion addressing whether and by what means migrants who are and will be detained at Guantánamo will be permitted to communicate with their family members, and whether and to what extent members of the media and press will be permitted access to those detained and/or the detention facilities.

Communications

6.  All internal communications within agency personnel at leadership roles within each agency related to the Guantánamo EO.

7.  All communications between the White House and agency personnel at leadership roles within each agency related to the Guantánamo EO.

Data and Planning Documents

8.  A list of all persons detained or designated for detention at the MOC, including their Name, Age, Gender, Status of Immigration Proceedings, and Country of Origin.

9.  Any records related to the logistics of implementing the Guantánamo EO, including staffing plans, lists of external contractors, budgetary documents including cost estimates, and potential funding sources.

Please search for responsive records regardless of format, medium, or physical characteristics, and including electronic records. Please provide the requested documents in the following format:

- In PDF format wherever possible;
- Electronically searchable wherever possible;
- Each paper record in a separately saved file;
- "Parent-child" relationships maintained, meaning that the Requestor must be able to identify the attachments with emails;
- Any data records in native format (i.e. Excel spreadsheets in Excel);

- Emails should include BCC and any other hidden fields; and
- With any other metadata preserved.

### E.  Requesters

The **Center for Constitutional Right**s ("CCR") is a non-profit, public interest legal and advocacy organization that engages in the fields of civil and international human rights. CCR's diverse issue areas include litigation and advocacy around immigration, as well as racial and ethnic profiling. One of CCR's primary activities is the publication of newsletters, know-your-rights handbooks, legal analysis of current immigration law issues, and other similar materials for public dissemination. These and other materials are available through CCR's Development, Communications, and Advocacy Departments. CCR operates a website, http://ccrjustice.org, which addresses the issues on which CCR works. CCR staff members often serve as sources for journalists and media outlets, including on issues related to racial justice, racial discrimination, and immigrant rights. In addition, CCR regularly issues press releases, has an active social media presence with thousands of followers, and issues regular email updates sent to over 50,000 supporters about developments and news pertaining to CCR's work.

**Detention Watch Network** ("DWN") is a national coalition of organizations and individuals working to expose and challenge the injustices of the U.S. immigration detention and deportation system and advocate for profound change that promotes the rights and dignity of all persons. DWN was founded in 1997 in response to the explosive growth of the immigration detention and deportation system in the United States. Today, DWN is the only national network that focuses exclusively on immigration detention and deportation issues. The Network is recognized as the "go-to" resource on detention issues by media and policymakers and known as a critical national advocate for just policies that promote an eventual end to immigration detention. As a member-led network, we unite diverse constituencies to advance the civil and human rights of those impacted by the immigration detention and deportation system through collective advocacy, public education, communications, and field and network-building. DWN has a well-known website featuring the latest news, information and developments on detention policy.

**Haitian Bridge Alliance** ("HBA") is a grassroots and community-based non-profit organization that advocates for fair and humane immigration policies and provides migrants and immigrants with humanitarian, legal, and social services, with a particular focus on Black migrants, the Haitian community, women and girls, LGBTQIA+ individuals, and survivors of torture and other human rights abuses. HBA regularly organizes Know Your Rights presentations, legal orientation trainings, and the recording and dissemination of explanatory videos for migrants in the United States and for those on the Mexico side of the U.S. border. HBA regularly takes new information learned and devise new Know Your Rights programs so that people in the United States and those attempting to enter the United States, including those

8

stranded in Mexico for extended periods, understand the new policy. HBA regularly disseminates information learned to international human rights mechanisms through reporting on the U.S.'s compliance with its human rights obligations, with a focus on U.S. border policies and their impact on Black people in transnational migration. HBA operates a website, https://haitianbridgealliance.org/, which addresses the issues on which HBA works. HBA staff members often serve as sources for journalists and media outlets, including on issues related to immigration, racial justice, U.S. policy towards Haiti and Haitian migrants, and immigrant rights. In addition, HBA regularly issues press releases, has an active social media presence where it regularly provides updates about developments and news pertaining to HBA's work.

### F. Fee Waiver

The Requesters are entitled to a fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(iii), 22 CFR § 171.16(a), 32 CFR § 286.12(l) and 6 C.F.R. § 5.11(k) on the grounds that "disclosure of the requested records is in the public interest because it is likely to contribute significantly to the public understanding of the activities or operations of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii). The Requester meets the requirements for a fee waiver because the subject of this request concerns the operations or activities of the government, the disclosure of the information is likely to contribute to a significant public understanding of government operations or activities, the Requester's primary interest is in disclosure, and the Requester has no commercial interest in the information. *See* 22 C.F.R. § 171.16. All Requesters have a track-record of publicizing and explaining government records received through FOIA.

The need for information related to the MOC and this specific EO is immediate and vital to tens of thousands of people, most importantly immigrants and their family members. Requesters seek relevant documents in order to gain critical information about the circumstances, plans, asserted legal authority to take such an extraordinary step to militarily detain individuals in the world's most notorious prison facility. Information about this unprecedented action is necessary for public understanding of the administration's plans and its compliance/non-compliance with its legal obligations. It is also critical for advocates like Requesters, so they can understand how best to protect the rights and safety of immigrants affected by the Guantánamo EO.

Disclosure in this case therefore meets the statutory criteria, and a fee waiver would fulfill Congress' legislative intent in amending FOIA. *See Judicial Watch Inc. v. Rossotti*, 326 F.3d 1309 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be liberally construed in favor of waivers of noncommercial requesters.") (citations omitted).

In the alternative, if no fee waiver is granted and the fees exceed $50.00, please contact the Requester's undersigned representative to obtain consent to incur additional fees. Processing

9

fees should be limited pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) ("[F]ees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by . . . a representative of the news media").

### G. Expedited Processing

Requesters are entitled to expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E); 32 C.F.R. § 286.8(e)(1)(i), (e)(1)(ii)(B), and (e)(3); 22 C.F.R. § 171.11(f)(1)-(4); and 6 C.F.R. § 5.5(e)(1)(i)-(ii) on the ground that there is an immediate and compelling need for the information.

Requesters' primary professional activities is information dissemination, and there is an urgent need to inform the public about why such a tremendous policy decision was made, and even more importantly, how it could affect thousands of people living in the U.S. 22 C.F.R. § 171.11(f)(2) and 6 C.F.R. § 5.5(e)(1)(ii). As of this FOIA request, there is scarce information available to the public as to how any transfers of people to the Guantánamo base would work or when they would begin, with U.S. government officials saying little to nothing publicly as to the implementation of the EO. As a result, immediate access to the requested records by Requesters[15] is crucial.

Critically, not obtaining the records on an expedited basis could pose an imminent threat to the life or physical safety of any person designated to be held at the MOC, 32 C.F.R. §286.8(e)(1)(i), 22 C.F.R. § 171.11(f)(1), and 6 C.F.R. § 5.5(e)(1)(i), and could also be expected to harm substantial humanitarian interests, 32 C.F.R. § 286.8(e)(1)(ii)(B) and 22 C.F.R. § 171.11(f)(3). As of the date of this request, migrants have already begun being sent from the U.S. to the Guantánamo base.[16] There exists virtually no information about how those sent to Guantánamo are being selected, who they are, or what conditions they are being held during transport or while at the base. A former State Department official has called the transfers "insane,"[17] and the transfers have been covered by media outlets nationally and internationally.[18]

---

[15]    As laid out above, dissemination of information for the public good is a key component of the work of each of the Requesters, all of whom regularly publish information such as reports, newsletters and other updates to their membership and the general public.

[16]    Ellen Mitchel, 1*0 'high-threat' migrants now at Guantanamo Bay: Pentagon*, The Hill (Feb. 5, 2025), https://thehill.com/policy/defense/5128305-migrants-guantanamo-bay-pentagon-trump-immigration-crackdown-dod-dhs/.

[17]    Ben Fox, *'Frankly Insane': Trump's Plan to Ship Migrants to Guantanamo Could Quickly Collapse*, Politico (Feb. 5, 2025), https://www.politico.com/news/magazine/2025/02/05/frankly-insane-trumps-plan-to-ship-migrants-to-guantanamo-could-quickly-collapse-00202374.

[18]    Maia Davies, *Trump sends first migrant detainees to Guantanamo Bay*, BBC News (Feb. 5, 2025), https://www.bbc.com/news/articles/cy0p1ykxyzjo.

Accordingly, Requesters expect an expedited processing determination within 10 days of the receipt of this FOIA request, pursuant to 32 C.F.R. § 286.8(e)(1), 22 C.F.R. § 171.11(f)(4), and 6 C.F.R. § 5.5(e)(4).

**Conclusion**

Requesters expect each agency to make a determination on this request within 20 days, as provided by statute. *See* 5 U.S.C. § 552(a)(6)(A)(i). If our request is denied, in whole or in part, we ask that each agency justify all deletions by reference to specific exemptions to FOIA. We also expect each agency to release all segregable portions of otherwise exempt material.

Thank you for your prompt attention to this matter. Please furnish all applicable records to: Ian Head, Center for Constitutional Rights, at **ihead@ccrjustice.org (*preferred*)** or by mail at PO Box 1606, San Pedro, CA 90733.

I certify that the above information is true and correct to the best of my knowledge.

Thank you,

Ian Head
Open Records Project Manager
Center for Constitutional Rights

11

# EXHIBIT 1



# Menu

# Search

PRESIDENTIAL ACTIONS

# EXPANDING MIGRANT OPERATIONS CENTER AT NAVAL STATION GUANTANAMO BAY TO FULL CAPACITY

January 29, 2025

MEMORANDUM FOR THE SECRETARY OF DEFENSE THE SECRETARY OF HOMELAND SECURITY

SUBJECT:    Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity

I hereby direct the Secretary of Defense and the Secretary of Homeland Security to take all appropriate actions to expand the Migrant Operations Center at Naval Station Guantanamo Bay to full capacity to provide additional detention space for high-priority criminal aliens unlawfully present in the United States, and to address attendant immigration enforcement needs identified by the Department of Defense and the Department of Homeland Security.

This memorandum is issued in order to halt the border invasion, dismantle criminal cartels, and restore national sovereignty.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

News

Administration

Issues

Contact

THE WHITE HOUSE

2/6/25, 11:15 AM
Case 1:25-cv-06214    Document 1-3    Filed 07/29/25    Page 20 of 45
Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity – The White House

1600 Pennsylvania Ave NW

Washington, DC 20500

THE WHITE HOUSE

WH.GOV

Copyright

Privacy

# EXHIBIT B



**DEPARTMENT OF DEFENSE**
**OFFICE OF THE SECRETARY OF DEFENSE/JOINT STAFF**
**FREEDOM OF INFORMATION**
**1155 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1155**

Ref: 25-F-2337
February 27, 2025

Mr. Ian Head
Center for Constitutional Rights
666 Broadway, Floor 7
New York, NY 10012

Dear Mr. Head:

This is a final response to your February 6, 2025 Freedom of Information Act (FOIA) request, a copy of which is enclosed for your convenience. The Office of the Secretary of Defense/Joint Staff (OSD/JS) FOIA Requester Service Center received your request on February 20, 2025, and assigned it FOIA case number 25-F-2337. We ask that you use this number when referring to your request.

Please note that your request was misdirected, as we only process requests for OSD and JS. There is no central FOIA processing point for records for the entire Department of Defense (DoD). FOIA processing is decentralized and delegated to those officials of the Military Departments and various DoD Components who generate and/or maintain the records being sought or reviewed. In this instance, the U.S. Southern Command (SOUTHCOM), which operates its own FOIA program, would have cognizance over the information you have requested.

In consideration of this fact, we have forwarded your request to SOUTHCOM for their direct response to you. For your convenience, contact information for the SOUTHCOM FOIA office is provided below:

United States Southern Command
Attn: SCSJA-FOIA
9301 NW 33rd St.
Doral, FL 33172-1202
southcom.miami.sc-cc.mbx.southcomfoia@mail.mil

Should you wish to inquire about mediation services, you may contact the OSD/JS FOIA Public Liaison, Toni Fuentes, by email at osd.mc-alex.oatsd-pclt.mbx.foia-liaison@mail.mil or by phone at 571-372-0462. You may also contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer at: email at ogis@nara.gov, or phone at 202-741-5770 or 1-877-684-6448.

This action closes your request with this office, and there are no assessable fees associated with this response.  If you have any questions or concerns about the foregoing or about the processing of your request, please do not hesitate to contact the Action Officer assigned to your request, Dylan Winters, at dylan.m.winters.ctr@mail.mil or 571-256-4749. Additionally, if you have concerns about service received by our office, please contact a member of our Leadership Team at 571-372-0498 or Toll Free at 866-574-4970.

Sincerely,

*for Pamela Andrews*
Stephanie L. Carr
Chief

Enclosure:
As stated

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LAS AMERICAS IMMIGRANT
ADVOCACY CENTER, *et al.*,

        Plaintiffs,

    v.

KRISTI NOEM, Secretary of Homeland
Security, in her official capacity, *et al.*,

Civil Action No. 25-0418

### DECLARATION OF COLONEL JENNIFER VENGHAUS

I, COLONEL JENNIFER VENGHAUS, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.     I am a Colonel in the United States Army and have served on active duty for 21 years. My prior positions include Legal Assistance Attorney (Fort Eisenhower, Georgia), Operational Law Attorney (Task Force 134 (Detainee Operations) in Iraq), Command Judge Advocate (513th Military Intelligence Brigade and 18th Engineer Brigade), Operational Law Attorney (United States Army Europe), Chief of Justice (82d Airborne Division), Personnel Law Attorney (Office of The Judge Advocate General, Pentagon), Special Victim Prosecutor (Fort Cavazos, Texas), Senior Plans Officer (Office of the Judge Advocate General, Pentagon), Executive Officer (United States Army Europe and Africa), Deputy Staff Judge Advocate (V Corps), and Staff Judge Advocate (United States Army South). I make the following statements based upon my years of service and experience in the United States military, personal knowledge, and information made available to me in my official capacity.

2.　　　I currently serve as the Staff Judge Advocate for Joint Task Force Southern Guard (JTF-SG), at Naval Station Guantanamo Bay, Cuba (NSGB).  I have held this position since 2 February 2025.  I am responsible for providing legal advice to the JTF-SG Commander and staff on all JTF-SG operations.  JTF-SG's mission is to support the illegal alien holding operations being led by Department of Homeland Security (DHS) at NSGB.

## Missions Conducted at Naval Station Guantanamo Bay

3.　　　NSGB serves as a key operational and logistics hub for the Department of Defense, supporting a variety of missions including maritime security, humanitarian assistance, and joint operations.   Its unique geographic location provides strategic advantages, enhancing U.S. defense capabilities in the region and serving as a critical forward operating base for various military and humanitarian activities. [1]

4.　　　Present on NSGB but separate from JTF-SG is Joint Task Force Guantanamo (JTF-GTMO) which, since 2002, has been responsible for the safe and humane custody of law of armed conflict detainees, as well as supporting ongoing military commission proceedings and other processes involving those detainees.  These operations take place on the "windward" side of NSGB.  (See attached map).

5.　　　Since the early 1990s, part of NSGB has been used for migrant operations. DHS's Immigration and Customs Enforcement (ICE) and the U.S. Department of State have housed migrants interdicted at sea with humanitarian protection concerns at the Migrant Operations Center (MOC) at NSGB.  The MOC is located on the "leeward" side of NSGB which is separated from the "windward" side by water.  Travel from one side to the other is conducted by boat.  (See attached map.)

---

[1] https://cnrse.cnic.navy.mil/Installations/NS-Guantanamo-Bay/

### Creation of Joint Task Force-Southern Guard

6.      On 20 January 2025, the President, in Executive Order (EO) 14165, "Securing Our Borders," directed the Secretary of Homeland Security to "take all appropriate actions to detain, to the fullest extent permitted by law, aliens apprehended for violations of immigration law until their successful removal from the United States."

7.      On 29 January 2025, President Trump issued a Presidential Memorandum directing the Secretary of Defense and Secretary of Homeland Security to "take all appropriate actions to expand the Migrant Operation Center at [NSGB] to full capacity to provide additional detention space for high-priority criminal aliens unlawfully present in the United States and to address attendant immigration enforcement needs identified by the Department of Defense and the Department of Homeland Security."[2]

8.      On 30 January 2025, the Secretary of Defense ordered the Commander, United States Southern Command, to expand migrant operations at NSGB.  JTF-SG was created to execute that directive.

9.      DHS, and more specifically Immigration and Customs Enforcement – Enforcement and Removal Operations (ICE-ERO) maintains custody of all illegal aliens at NSGB, while JTF-SG assists in the care of the illegal aliens.  The role of military forces at JTF-SG is to provide for the safe and humane care and control of certain illegal aliens at NSGB when requested by and in support of DHS.  JTF-SG currently provides supplies, food, care, shelter, medical support, and security when it exceeds the capability of DHS.

10.     Beginning on 31 January 2025, members of United States Army South deployed to NSGB.  As of 19 February 2025, JTF-SG consists of approximately 985 personnel, which

---

[2] https://www.whitehouse.gov/presidential-actions/2025/01/expanding-migrant-operations-center-at-naval-station-guantanamo-bay-to-full-capacity/

includes JTF-SG staff, medical, security, engineer, and logistics personnel.  I arrived at NSGB on 2 February 2025.  On 4 February 2025, JTF-SG reached initial operating capacity when the first flight of ten illegal aliens arrived at NSGB.

<b><u>Transfer to and Housing of Illegal Aliens at NSGB</u></b>

11.     The Department of Homeland Security determines who is transferred to NSGB and categorizes the illegal aliens by threat level prior to their arrival.  High threat illegal aliens (HTIAs), are those who DHS has advised pose a heightened security threat, and they are housed in Camp VI, a hard-sided secure facility located on the windward side of NSGB, formerly used to house law of armed conflict detainees.  Low and medium threat illegal aliens (LTIAs and MTIAs) are currently housed at the MOC building on the leeward side of NSGB.

12.     As of 17 February 2025, DHS has transferred 128 HTIAs to NSGB, 127 of whom are currently housed in Camp VI, with one returned back to the United States.  Camp VI has a maximum capacity of approximately 175, but current maximum capacity is 131 HTIAs due to ongoing maintenance being performed in certain cells.  United States Army military police serve as guards inside Camp VI, under the oversight of ICE-ERO.

13.     Between 9 February 2025 and 13 February 2025, DHS transferred 51 LTIAs to NSGB.  The LTIAs are currently housed in the MOC building on the leeward side of NSGB.  ICE-ERO agents and contractors provide all interior security for the LTIAs housed at the MOC building, while military personnel assigned to JTF-SG provide exterior perimeter security.

14.     Military personnel assigned to JTF-SG, with support from DoD contracts, provide food and medical support to the illegal aliens held at the MOC and in Camp VI.  Supplies for illegal aliens, both at the MOC and in Camp VI, are provided by both DoD and DHS.

4

### Individuals Named in Lawsuit

15.     Tilso Ramon Gomez Lugo and Luis Alberto Castillo Rivera arrived at NSGB on 4 February 2025, and are housed in Camp VI.

16.     Yoiker David Sequera arrived on 9 February 2025, and is housed at the MOC building.

### Counsel Requests

17.     Between 4 February 2025 and 12 February 2025 (the date a complaint was filed in Federal District Court), no HTIA counsel made any requests for access to counsel.  Any such request would have been noted by facility staff and brought to my attention.  Also, JTF-SG did not receive any requests from DHS to facilitate illegal alien access to counsel.

### Counsel Calls for Three Individuals Named in Lawsuit

18.     On 12 February 2025, I was informed that attorneys seeking to represent Tilso Ramon Gomez Lugo, Luis Alberto Castillo Rivera, and Yoiker David Sequera in federal court wished to have unmonitored telephonic conversations with them.

19.     On 14 February 2025, those attorneys proposed dates and times for these conversations.  Through consultations with DOJ attorneys and ICE personnel at NSGB, arrangements were made for those phone calls to occur on 17 February 2025.

20.     On 17 February 2025, Tilso Ramon Gomez Lugo, Luis Alberto Castillo Rivera, and Yoiker David Sequera were each given the opportunity for a phone call with the attorneys. It is my understanding that each illegal alien had one 60-minute unmonitored telephone conversation with the plaintiff-petitioner attorneys.  The phone call involving Mr. Sequera was

held at the MOC, while the other two calls were conducted near Camp IV, under the procedures detailed below.

### Notice to HTIAs

21.     On 19 February 2025, I was informed that ICE-ERO personnel posted a DHS-authorized notice at the MOC, informing LTIAs in both English and Spanish of their ability to contact an attorney and providing them with the procedures on how to request such a call. JTF-SG personnel posted the same notice in the common area of each cell block at Camp VI on 19 February 2025.

22.     Subject to the procedures described below, as of 17 February 2025, HTIAs at Camp VI have the opportunity to have confidential telephone calls with counsel, if those HTIAs or their counsel request such a call.

### General Procedures for HTIA-Counsel Calls

23.     For the HTIAs housed at Camp VI, calls with counsel will be conducted in a building near Camp VI. It has six telephones in six separate rooms, each with a table and chair (one phone is currently inoperable and waiting on repair). These rooms can facilitate private telephonic conversations between the illegal alien and the counsel while guards maintain line of sight on the HTIA through the use of video monitoring (which does not include sound). This building is a short walk from Camp VI. ICE-ERO is responsible for escorting HTIAs from Camp VI to these telephones. For operational security reasons, this movement requires two ICE-ERO escorts for each HTIA.

24.     HTIAs in Camp VI will be able to inform facility staff regarding desire to have a telephone call with counsel. The facility staff will have this information forwarded in a timely manner to the relevant counsel, who can then initiate a call request as described below.

25.     Counsel will use a standardized form to request a counsel call with an HTIA. The counsel will forward the completed form to a DoD email address designed to process such requests. DoD personnel responsible for that email account will coordinate with facility staff regarding the proposed day/time for that call. At the agreed-upon time, facility staff will bring the HTIA to the building for the call.

26.     A document memorializing this process and providing specific information on the above steps is being prepared for use by counsel.

### Legal Mail

27.     The transmission of privileged legal mail between counsel and illegal aliens at the MOC and in Camp VI will generally follow the procedures used in the habeas litigation involving law of war detainees. Legal mail originating from counsel will be delivered to NSGB on a weekly basis via the Defense Courier Service. Legal mail originating from IAs will also be transported to the Washington, D.C. area on a weekly basis.

28.     A document memorializing this process and providing specific information on the above steps is being prepared.

### In person counsel visits

29.     JTF-SG and DHS are evaluating the feasibility and necessity of authorizing counsel travel to NSGB for in-person counsel visits, in light of the extensive logistical challenges with such visits, the potential need for counsel to possess security clearances, and the potentially high volume of counsel attempting to conduct such visits.


I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.

7

Dated: 19 February 2025

VENGHAUS.JENNIFE
R.LYNN.1255608254

Digitally signed by
VENGHAUS.JENNIFER.LYNN.12556
08254
Date: 2025.02.19 22:03:18 -05'00'

JENNIFER L. VENGHAUS
Colonel, U. S. Army
Staff Judge Advocate
Joint Task Force Southern Guard

# EXHIBIT C

GUANTANAMO BAY OVERVIEW

Leeward Side

Windward Side

CUBA 1:20000

Legend
— Roads
— Farm Runs

SCALE: 1:20000

FOR PLANNING PURPOSES ONLY.
NOT TO BE USED FOR TARGETING OR NAVIGATION.

UNCLASSIFIED

UNCLASSIFIED

# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LAS AMERICAS IMMIGRANT
ADVOCACY CENTER, *et al.*,

        Plaintiffs,

     v.

KRISTI NOEM, Secretary of Homeland
Security, in her official capacity, *et al.*,

Civil Action No. 25-0418

## DECLARATION OF LIEUTENANT COLONEL ROBERT GREEN

I, LIEUTENANT COLONEL ROBERT GREEN , pursuant to 28 U.S.C. § 1746, hereby

declare as follows:

1.      I am a Lieutenant Colonel in the United States Army and have served on active

duty for 30 years. My prior positions include Platoon Leader and Executive Officer (XO), 256th

Military Police Company Internment/Resettlement (I/R), Fort Leavenworth, KS, Plans Officer,

705th Military Police Battalion (I/R), Fort Leavenworth, KS and Taji (Task Force 134 (Detainee

Operations), Iraq, Battalion Logistics Readiness Officer (S-4), 793rd Military Police Battalion,

Joint Base Elmendorf Richardson (JBER), AK, Commander, Headquarters and Headquarters

Detachment (HHD), 793rd Military Police Battalion, JBER, AK and Gardez, Afghanistan, S3,

532nd Engineer BN (Provisional), JBER, Alaska; Battalion Operations Officer (S3) and

Executive Officer XO, 40th Military Police Battalion (Detention), Fort Leavenworth, KS , Joint

Exercise Planner, Chairman's Exercise Program Division (CEPD), Joint Training Division, Joint

Staff J-7, Pentagon, Washington D.C; Executive Assistant to Director for Joint Force

Development, Joint Staff J-7, Pentagon, Washington D.C, Chief, Strategic Initiatives Group

(SIG), Office of the Provost Marshal General (OPMG), Headquarters Department of the Army (HQDA) Washington D.C.; Commander, 508th Military Police Detention Battalion & Northwestern Joint Regional Correctional Facility (NWJRCF) Joint Base Lewis-McChord, WA. I make the following statements based upon my years of service and experience in the United States military, personal knowledge, and information made available to me in my official capacity.

2.      In response to a Presidential Memorandum on 29 January 2025, on 30 January 2025, the Secretary of Defense ordered the Commander, United States Southern Command, to expand migrant operations at NSGB.  Joint Task Force – Southern Guard (JTF-SG) was created to execute that directive

3.      I currently serve as the Commander of Task Force Guardian, the element responsible for safeguarding and controlling illegal aliens under the direction of, and in support of the Department of Homeland Security (DHS) and Immigration and Customs Enforcement (ICE) agents. Task Force Guardian supports Joint Task Force Southern Guard (JTF-SG) at Naval Station Guantanamo Bay, Cuba (NSGB).  I have held this position since 14 February 2025.  In coordination with DHS and ICE agents and contractors, I oversee DoD's involvement in Holding Area Operations, ensuring humane treatment of illegal aliens while maintaining the security of both the IAs and the security personnel within TF-Guardian.  I also advise the JTF-SG Commander and staff on all Holding Area Operations at the Windward High Threat Illegal Alien (HTIA) Holding Facility (Camp VI).  JTF-SG's mission focuses on supporting DHS-led illegal alien holding operations at NSGB.

**Windward Facility (CAMP VI) Conditions**

4.      The Windward Facility, completed in 2006, was built as a medium security facility, using layouts and operational practices inspired by U.S. prison-system facilities. The facility uses single cells, and when fully operational, it can house up to 175 IAs. IAs reside in eight pods, each containing approximately 22 cells. Each pod consists of a two-story wedge-shaped wing connected to the main structure. Each pod's first floor contains a common area where IAs can interact, eat meals, and take showers.

5.      The facility, now over 19 years old, experiences ongoing maintenance issues, including plumbing, electrical systems, camera systems, and locking mechanisms. These issues require constant attention, with staff completing routine fixes on an average of 25 cells per week. As new IAs rotate through the facility, additional wear and tear increases the workload for the facility maintenance representative (FMR), responsible for maintaining to operational capacity and ensuring safe holding area operations. IAs are only housed in cell blocks that are in the best condition and have working plumbing, electrical systems, camera systems, and locking mechanisms. The remaining cell blocks (about 25% of the facility) is undergoing regular maintenance to bring it up to standards.

6.      Every IA at the Windward Facility receives shelter and ventilation. Each HTIA has access to potable drinking water, a toilet, and a sleeping area free of insects.

7.      The average temperature is maintained between 72- and 74-degrees Fahrenheit, measured at various locations within the facility using a laser thermometer and an environmental weather meter (Kestrel 4000). Each IA receives three nutritionally balanced meals daily, prepared in compliance with United States Department of Agriculture (USDA) dietary guidelines, with adjustments made for religious, cultural, portion, and medical requirements.

3

8.      Meals are prepared in the same kitchen and in the same manner as those for military personnel stationed on the island unless otherwise requested. Qualified food handlers prepare and distribute meals based on the IA headcount and a standardized recipe card, which dictates uniform serving sizes using a "one size fits all" approach. The serving size does not account for differences in individual body weight, which could contribute to weight loss for some IAs.

9.      Several IAs formerly housed at the Windward Facility have voluntarily refused meals, which may have also contributed to weight loss. However, food and water are never withheld.[1]

10.     Each IA also receives regular opportunities for indoor recreation,[2] (twice daily for a maximum of four hours total currently) and personal hygiene. Personal hygiene (including showers) may be delayed up to 48 hours, depending on guard force operational capacity; however, IAs typically receive one shower per day. As the Windward Facility transitions to a fully communal housing style, additional recreation time may become available.  Lastly, IAs at Windward are provided weekly laundry services (Every Thursday).

11.     The current Guard Force at the Windward Facility consists of twenty-eight (28) Soldiers, two (2) ICE Agents, and seven to eight (7-8) ICE contractors from Akima Infrastructure Protection (AIP) or Akima Global Services (AGS), totaling 37 personnel per 12-

---

[1] At times, the IAs were provided disposable plastic water bottles which some IAs used to inflict self-harm.  Upon discovering this, water bottles were removed temporarily and replaced with disposable cups of water.

[2] Although limited outdoor recreation was initially permitted in the first days of the operation, it was discontinued upon discovering safety and security issues.  For these reasons, outdoor recreation was discontinued at Windward.  DoD is working to address the issues and will reinstate daily outdoor time if those issues can be addressed.

hour shift (approximately 74 personnel over a 24-hour period). These numbers may change based upon operational requirements.

12.     As of 7 March, the facility maintains only one designated administrative segregation area, known as the Special Housing Unit (SHU).  The SHU, or H-Block, houses IAs for short periods when their behavior disrupts the climate of their housing block.  This system encourages compliance with facility rules while minimizing disruptions to other IAs.  The SHU is also used to separate IAs from general population due to medical concerns, ensuring that communicable disease and other ailments are segregated from the rest of the IA population. Since its opening, a total of 0 IAs have been placed in the SHU, 0 for disciplinary reasons, and 0 for medical reasons.

13.     Before the SHU opened, staff secured and controlled IAs who threatened to harm themselves or others using four-point restraints (hands and legs) or five-point restraints (a restraint chair or medical stretcher). As outlined in the ICS Detention Standard, staff check IAs every 15 minutes to ensure proper blood circulation. With the opening of the SHU, the Guard Force will have the option to limit the use of these types of restraints for an extended period to address threats of harms to self or others, by providing an alternative location for IAs in this category.

14.     Additionally, if used, IAs remain in restraints for no more than two hours before a reevaluation by medical staff and the Guard Force supervisor (ICE Agent as primary; Military as secondary). Staff also offer IAs the opportunity to use the bathroom unless the IA actively resists or becomes combative when released for that purpose.

15.     Staff receive rigorous training on the proper use of the restraint chair. When it is employed, medical providers observe its use. The restraint chair may be used in emergency

situations (e.g., to immediately prevent self-harm) or in a deliberate manner (e.g., for disciplinary purposes). In cases of deliberate use, the on-call lead ICE agent must authorize its application. Once removed from the restraint chair, the IA is immediately examined by a medical provider.

16.     Since being assigned as the Commander of Task Force Guardian, the Windward Facility has recorded six (6) incidents involving the use of the restraint chair or a medical stretcher. All occurred on 18 February 2025 and were classified as self-harm events. Three of these incidents took place within minutes of each other, all events on this day involved Venezuelan IAs.

### Migrant Operation Center (MOC) Conditions

17.     The primary purpose of the MOC has been to temporarily house migrants intercepted at sea by the US Coast Guard or other agencies.  Since the 1990s, the MOC has provided basic care while U.S. authorities determine each migrant's eligibility for asylum, repatriation, or resettlement to a third country.  The MOC includes two hard-stand buildings, the MOC Facility and the MOC Special Housing Unit (SHU) which is not in use (due to required repairs), along with two tent holding areas known as MOC East and MOC West.

18.     The MOC Facility is a concrete building designed to provide shelter and ventilation for communal living. Every IA at the MOC Facility has access to potable drinking water, a toilet, and a sleeping area free of insects. IAs may reside in groups of up to six per housing area, with a maximum capacity of 50 IAs at the MOC Facility.

19.     The average temperature is maintained between 72- and 74-degrees Fahrenheit, measured at various locations using a laser thermometer and an environmental weather meter (Kestrel 4000). Like the Windward Facility, IAs receive three nutritionally balanced meals daily, prepared in compliance with USDA dietary guidelines, with adjustments made for religious,

cultural, or medical requirements. The MOC also provides regular opportunities for recreation and personal hygiene.

20.     The MOC Guard Force is composed entirely of ICE Agents and ICE contractors (AIP or AGS). United States Marines provide security outside the MOC Facility 24 hours a day. Additionally, a Marine Quick Reaction Force (QRF) is available around the clock to provide emergency security support if needed.

21.     MOC East and MOC West have not been used to house IAs.  At this time, if used in the future, MOC East can hold up to 224 low-threat illegal aliens (LTIAs), and MOC West can house up to 296 LTIAs, providing a combined capacity of 520 LTIAs.  MOC East and West both have a portable containerized shower and latrine system that IAs may utilize.

### Telecommunication

22.     Windward and the MOC allow IAs to make calls to their legal counsel upon request from the IA or attorney. COL Jennifer Venghaus, Staff Judge Advocate for Joint Task Force Southern Guard (JTF-SG), previously addressed access to legal counsel in a Declaration dated 19 February 2025. I adopt by reference the procedures she outlined in that declaration. Nevertheless, since her declaration was signed, ICE personnel have tested the phone lines, to include making a call to the ABA attorney referral line, to confirm its operation and functionality.  Additionally, beginning on 2 March 2025, every IA at the Windward Holding Area is authorized one 5-minute personal phone call per day between the hours of 0830-1230. IAs at the MOC Facility are also allowed a 5-minute personal phone call once a day. Personal calls at both the Windward and the MOC are monitored by ICE Agents or ICE contractors. Attorney phone calls are not monitored, but ICE personnel maintain line of sight on the IAs during attorney phone calls through the use of video monitors with no sound.

## **Use of Restraints**

23.     The current practice requires the use of hand and leg restraints anytime an IA moves outside their Cell Block in the Windward Facility.  This practice helps protect both the Guard Force and the IA from potential security risks and enables the Guard Force to prevent IAs from accidental falls while being moved.  Guard Force personnel must maintain two points of contact with the IA at all times during escorts. This practice will be reassessed as appropriate.

## **Policy on Use of Strip-Searching and Frisking**

24.     As part of the intake process at the Windward Holding Area, IAs undergo a series of search procedures to ensure the safety, security, and welfare of both IAs and staff.  These searches occur at various stages while IAs are at the Windward Holding Area, and during movement, following established guidelines that protect individual rights and dignity while maintaining security.

25.     A preliminary frisk search occurs when the IAs arrive via air at Naval Station Guantanamo Bay.  This pat-down inspection detects any concealed contraband that could threaten staff, other IAs, or the individual being searched.  Although limited in scope, this search plays a critical role in ensuring safe intake procedures.

26.     One comprehensive strip search is conducted upon arrival at the Windward HTIA Facility.  This search serves several purposes, including: (1) Identifying any distinguishing marks, tattoos, or physical identifiers that may assist in verifying identity or tracking prior criminal history. (2) Detecting and confiscating any contraband, such as weapons, drugs, or unauthorized personal items, that may have been concealed on or within the individual's body. (3) Assessing the individual's health and welfare, ensuring there are no visible injuries, infections, or other immediate medical concerns requiring attention.  To maintain privacy and

8

respect, the strip search is conducted by a member of the Guard Force who is the same gender as the individual being searched. Searches follow protocols designed to ensure the process is conducted professionally, thoroughly, and with the least amount of intrusion necessary (away from public view, using view obscuring resources) to achieve security objectives.

27. Additionally, staff conduct frisk searches each time an IA leaves a holding area for medical appointments, required meetings, or relocation to another housing unit. Frisk searches occur before and after each movement to prevent the introduction or removal of contraband and to maintain the safety of the IA population, staff, and facility operations.

28. All search procedures are performed under ICE guidance and follow established policies, legal standards, and human rights guidelines to ensure a proper balance between security and the respectful treatment of IAs in accordance with ICE's National Detention Standards.

## Medical Care

29. Medical care for IAs relies on a combination of facilities and resources on both the Leeward and Windward sides of the island.

30. On the Leeward side, the Military Medical Company Area Support (Role II) provides medical care near the Migrant Operations Center (MOC). This facility also conducts initial medical screenings for low-threat illegal aliens upon their arrival. If advance care is required, IAs could be transported to the Naval Hospital Guantanamo Bay on the Windward side.

31. On the Windward side, medical care, including an infirmary and behavioral health resources are available. The facility offers comprehensive care, including dental services, using a combination of Department of Defense and Department of Homeland Security medical personnel. For after-hours emergencies, staff transport IAs to the emergency room at Naval

Hospital Guantanamo Bay. This process requires securing the IA in a transport van, deploying a transport team, and moving the IA approximately two miles from the holding facility to the hospital. The medical care provided to IAs is comparable to the care provided at Guantanamo Bay to U.S. military personnel stationed there. To my knowledge, no IA has ever been denied medical treatment or appropriate care for any ailment or injury.

### **Staff Misconduct**

32.     Staff misconduct is taken very seriously. Any credible allegations of actions that violate the basic rights of individuals housed at this facility will be thoroughly investigated and addressed in accordance with all applicable laws, regulations, and the authorities prescribed by the appropriate governing agencies. We are committed to ensuring a safe, respectful, and lawful environment for all individuals in our care, and any staff found to have engaged in misconduct will be held fully accountable.


I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.


Dated:  10 March 2025

_____
ROBERT W. GREEN
Lieutenant Colonel, U. S. Army
Military Police
Commander Task Force Guardian